UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

Webuild S.p.A, f/k/a Impregilo S.p.A.,

          Plaintiff,

v.

Argentine Republic,

          Defendant.

Civil Action No.   21-cv-2464

# COMPLAINT

Plaintiff Webuild S.p.A., f/k/a Impregilo S.p.A. ("Plaintiff"),[1] by and through its undersigned counsel, alleges as follows for its Complaint against Defendant the Argentine Republic ("Argentina"):

## Nature of the Action

1. This is an action to recognize and enforce an arbitral award (the "ICSID Award")[2] issued on June 21, 2011 in ICSID Case No. ARB/ARB/07/17 in favor of Plaintiff and against Argentina. The ICSID Award was issued by an arbitral tribunal (the "Tribunal") following arbitration proceedings conducted in accordance with the Convention on the Settlement of Investment Disputes between States and Nationals of Other States (the "ICSID Convention").[3]

---

[1] Due to a name change in May 2020, Webuild S.p.A. is formerly known as Salini Impregilo S.p.A. Due to a merger between Impregilo S.p.A. and Salini Costruttori in 2014, Salini Impregilo S.p.A. itself is formerly known as Impregilo S.p.A. Thus, because Plaintiff was known as Impregilo S.p.A. when it submitted its Request for Arbitration in 2007, the underlying arbitral action is styled *Impregilo S.p.A. v. Argentine Republic*.

[2] A true and correct copy of the ICSID Award certified by the Secretary General of ICSID is attached hereto as Exhibit A. True and correct copies of the Concurring Opinion of Professor Brigitte Stern and Dissenting Opinion of Professor Judge Charles N. Brower are attached here to as Exhibits B and C, respectively.

[3] A true and correct copy of the ICSID Convention is attached hereto as Exhibit D.

1

Pursuant to Article 54 of the ICSID Convention and 22 U.S.C. § 1650a, Plaintiff respectfully requests that this Court (1) enter an order recognizing and enforcing the ICSID Award in the same manner as a final judgment issued by a court of one of the several states, (2) enter a judgment in Plaintiff's favor in the amounts and currency denominations specified in the ICSID Award, and (3) grant any other and further relief that the Court may deem appropriate.

## The Parties

2. Plaintiff is a corporation organized under the laws of Italy.

3. Defendant Argentina is a foreign state within the meaning of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), 1602-1611.

## Jurisdiction and Venue

4. This Court has subject matter jurisdiction over this proceeding pursuant to 28 U.S.C. § 1605(a)(6), as this case falls under the FSIA exception for cases brought to confirm arbitration awards that "are or may be governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards," and 22 U.S.C. § 1650a.

5. Personal jurisdiction over Argentina is expressly conferred by 28 U.S.C. § 1330(b), which provides that this Court may exercise personal jurisdiction over a foreign state in any action where service has been made in accordance with 28 U.S.C. § 1608 and over which the Court has subject matter jurisdiction.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(f)(4).

**Factual Background**

**I.        Summary of the Dispute**

7.        In October 1999, Plaintiff (then known as Impregilo S.p.A.), as part of a consortium with other international companies, was awarded a water and sewage service concession in a certain area within the Province of Buenos Aires (the "Province"). Plaintiff and its partners thereafter formed and funded AGBA, an Argentinian Company. In December 1999, the Province and AGBA executed the Concession Contract (the "Concession Contract") to provide water and sewage services to an area within the Province.[4]

8.        Under Article 1.8 of the Concession Contract, AGBA undertook to make all investments required to implement the qualitative and quantitative goals set forth by the Service Optimization and Expansion Program ("POES"), an investment program to be designed by the Concessionaire, in this case AGBA, and approved by the Organismo Regulador de Aguas Bonaerense ("ORAB").[5] The purpose of the POES was to expand the provision of water and sewage services and to guarantee the maintenance and improvement of the systems required for such provision throughout the specified area, "enabling efficient administration and operation."[6] Specifically, the POES consisted "of six (6) consecutive Five-Year Plans, . . . [m]oreover, . . . updates, adjustments, and changes . . . ."[7] Further, AGBA was required to undergo the following procedure with regards to the POES it designed:

> For each of the five-year periods covered by the term of the POES, the Concessionaire shall present to the Regulatory Agency draft Five-Year Plans explaining, adjusting and providing the necessary updates to fulfill the coverage goals and Service goals established in the POES . . . .

---

[4]   Ex. A, ¶ 14.

[5]   Ex. A, ¶ 15 (quoting the Concession Contract, Arts. 1.8, 3.3, 5.1).

[6]   Ex. A, ¶ 15 (quoting the Concession Contract, Art. 5.2).

[7]   Ex. A, ¶ 15 (quoting the Concession Contract, Art. 5.1).

>The project for the first Five-Year Plan shall be submitted within three (3) months since Contract execution. The draft for each subsequent Five-Year Plan must be presented at least one year in advance of the end date of the applicable five-year period. The Regulatory Agency must request any changes and clarification deemed necessary. Upon approval of the draft presented by the Concessionaire, it shall become a Five-Year Plan and shall become an integral part of the POES, and its fulfillment shall be mandatory.[8]

9. In January 2000, AGBA took possession of the concession, and in March 2000, it presented its first Five-Year Plan to the privatized Provincial water and sewage regulating facility in accordance with the quantitative and qualitative goals set forth by the POES.[9] After amendments were instituted, ORAB approved the revised plan in January 2001.[10]

10. In May 2001, AGBA alerted the Minister of Public Works and Services of the Province that it was facing considerable difficulty in obtaining payments for its services from customers, thereby making it impossible for it to achieve the goals of its Five-Year-Plan. AGBA asked that a work commission be created to analyze appropriate solutions and temporarily suspend AGBA's expansion objectives under the Five-Year Plan until such solution could be reached.[11]

11. Later that same month, the Undersecretary of Public Services of the Province replied to AGBA that "the issue of non-collection rates was a business risk which AGBA had to bear in accordance with the terms of the Concession Contract." The Ministry did agree, however, to set up a working commission to modify the Contract in light of AGBA's collection difficulties.[12]

12. Throughout the summer of 2001, ORAB repeatedly asked AGBA to temporarily suspend its execution of the POES and refrain from billing work charges due the severe economic

---

[8] Ex. A, ¶ 15 (quoting the Concession Contract, Art. 5.3).

[9] Ex. A, ¶ 15 n.1.

[10] Ex. A, ¶ 20.

[11] Ex. A, ¶ 21.

[12] Ex. A, ¶ 22.

crisis in Argentina at the time.[13]  In August 2001, ORAB's Technical Department recommended suspension of the POES notwithstanding that it found AGBA's performance during the first year of the concession to have acceptably complied with the POES.[14]  AGBA subsequently began entreating the Governor of the Province to "arrange immediately bilateral negotiations in order to decide on the most suitable mechanisms to restore the equilibrium of the economic and financial equation of the Concession Contract."[15]

13.     In October 2001, ORAB disallowed AGBA from increasing tariffs in accordance with an agreed-upon coefficient within the Concession Contract because "neither the goals set forth in the Concession Contract nor those specified in the POES had been attained."[16]  Then, throughout 2002 and despite AGBA's frequent requests for negotiation, the Federal Argentine Government together with ORAB:  "pesified"[17] utilities contracts, including the Concession Contract, at parity level and froze tariffs;  prevented AGBA from billing work charges;  and suspended AGBA's right to interrupt water service to customers who had not paid their bills.[18]  In December 2002, however, ORAB concluded that AGBA had met the goals of the POES for 2000 and granted AGBA's request for a suspension to its POES obligations for the year 2002.[19]

---

[13]   Ex. A, ¶¶ 23, 24.

[14]   Ex. A, ¶ 25.

[15]   Ex. A, ¶ 26.

[16]   Ex. A, ¶ 27.  The coefficient was indicated within the Annex Ñ to the Concession Contract.

[17]   Contracts are "pesified" when the peso has been unpegged from the dollar, thereby rendering them much cheaper.  Here, the Federal Argentine Government took amounts specified in U.S. Dollars and converted them to pesos, unilaterally amending the Concession Contract.  Since they unpegged the peso from the dollar, it made public contracts much cheaper.

[18]   Ex. A, ¶¶ 28-39.

[19]   Ex. A, ¶¶ 40-41.

14. In 2005, the Province approved an agreement with the Aguas Bonaerenses S.A. ("ABSA"), which had taken over a concession for other areas within the Province.[20] Pursuant to the agreement, ABSA was allowed to "make gradual increases of tariffs and was granted certain subsidiaries."[21] When AGBA requested similar tariff increases, it was rejected.[22]

15. Then, in March 2006, the new utility control agency, Organismo de Control del Agua de Buenos Aires ("OCABA"), "issued a report in which it concluded that AGBA had violated in several ways its obligations under the Concession Contract and the POES."[23] In July 2006, OCABA fined AGBA for "having failed to handle certain complaints in a timely fashion."[24] Finally, in July 2006, the Province Governor terminated the Concession Agreement "due to AGBA's fault," transferring AGBA's water and sewage service concession to ABSA.[25]

## II. The Treaty

16. The relationship and dispute between Plaintiff and Argentina is governed by the Agreement between the Argentine Republic and the Italian Republic on the Promotion and Protection of Investments (the "Treaty"),[26] signed on May 22, 1990 and entered into force on October 14, 1993.[27]

17. The substantive obligations of each Party to protect the investors of the other Party, as well as their investments, are set forth, in part, in Articles 2, 3, and 5 of the Treaty.

---

[20] Ex. A, ¶ 34.
[21] Ex. A, ¶ 43.
[22] Ex. A, ¶ 44.
[23] Ex. A, ¶ 45.
[24] Ex. A, ¶ 47.
[25] Ex. A, ¶ 48.
[26] A true and correct English version of the Treaty is attached hereto as Exhibit E.
[27] Ex. A, ¶ 12.

18. Article 2 provides that "Each Contracting Party shall promote investments in its territory by investors of the other Contracting Party and shall accept such investments in accordance with its laws" and that "[i]nvestments made by investors of each Contracting Party shall at all times be accorded fair and equitable treatment. Neither Party shall impair by arbitrary or discriminatory measures the management, maintenance, enjoyment, transformation, cessation or disposal of investments made in its territory by the other Contracting Party's investors."

19. Article 3 provides, *inter alia*, that "Each Contracting Party shall, within its own territory, accord to investments made by investors of the other Contracting Party . . . a treatment that is no less favorable than that accorded to its own investors or investors from third-party countries."

20. Article 5 provides, *inter alia*, that:

(a) Neither Contracting Party may adopt any measure that restricts . . . the right to property, possession, control, or enjoyment in relation to the investments made by investors of the other Contracting Party, except upon specific provisions laid down by law, judgments, or decisions rendered by a competent court and other general non-discriminatory provisions intended to regulate economic activities.

(b) Investments by investors of one of the Contracting Parties shall not be nationalized, expropriated, seized, or otherwise appropriated, either directly or indirectly, through measures having an equivalent effect in the territory of the other Party, unless the following conditions are complied with:

- the measures are for a public purpose, of national interest or security;

- they are taken in accordance with due process of law;

- they are non-discriminatory or contrary to the commitments undertaken;

- they are accompanied by provisions for the payment of prompt, adequate and effective compensation . . . .

21. Article 1(2) of the Treaty defines the term "investor" as, *inter alia*, "any individual or legal entity of a Contracting Party who has made, makes, or has undertaken to make investments in the territory of the other Contracting Party." Article 1(1) of the Treaty defines the term "investment" as, in relevant part:

7

> [I]n accordance with the host country laws and regardless of the selected legal form or any other connected law, any contribution invested or reinvested by an individual or a legal entity of one Contracting Party in the territory of the other Party, in accordance with the laws and regulations of the latter. Within this general framework, it includes, in particular though not exclusively: . . .
>
> b) shares of stock, interests or any other form of participation, including minority or indirect interest, in a company established in the territory of each Contracting Party."

22. Plaintiff is an Italian company incorporated under the laws of Italy and managed from within Italian territory. Therefore, the Tribunal found that Plaintiff is an investor for the purposes of this Treaty.[28]

### III. The Parties' Agreement to Arbitrate

23. Article 8 of the Treaty, pertaining to disputes between a Contracting Party and investors of the other Contracting Party, provides as follows:

> 1. Any dispute regarding an investment between an investor of one of the Contracting Parties and the other Party, arising out of or relating to this Agreement, shall, to the extent possible, be settled through friendly consultation between the parties to the dispute.
>
> 2. If the dispute cannot be settled amicably, it may be submitted to the competent judicial or administrative courts of the Party in whose territory the investment is made.
>
> 3. Where, after eighteen months from the date of notice of commencement of proceedings before the courts mentioned in paragraph 2 above, the dispute between an investor and one of the Contracting Parties has not been resolved, it may be referred to international arbitration.
>
> . . .
>
> 5. Where the dispute is submitted to international arbitration, the investor may choose to refer the dispute either to a) [t]he International Centre for the Settlement of Investment Disputes (ICSID) . . . provided that each Party to this Agreement is a signatory State to such Convention . . . .
>
> 7. The arbitral tribunal shall decide the dispute in accordance with the laws of the Contracting Party involved in the dispute – including its rules on conflict of laws --, the provisions of the Agreement, the terms of any possible specific agreement concluded in relation to the investment as well as with the applicable principles of international law.

---

[28] Ex. A, ¶¶ 138, 140.

8. The arbitral award shall be final and binding on the parties to the dispute. Each Party undertakes to comply with any such award in accordance with its domestic laws and the relevant international conventions in force in both Contracting Parties.

24. Article 8 of the Treaty memorializes Italy and Argentina's consent to the arbitration of claims by an investor of a Party against the Other Party. Per Article 8, when a dispute arises with respect to a Party's compliance with its obligations thereunder, "[w]here the dispute is submitted to international arbitration, the investor may choose to refer the dispute either to a) [t]he International Centre for the Settlement of Investment Disputes (ICSID) . . . provided that each Party to this Agreement is a signatory State to such Convention . . . ."

25. By filing its Request for Arbitration on May 23, 2007,[29] Plaintiff submitted its claims to arbitration under the ICSID Convention (which both Italy and Argentina signed and ratified)[30] pursuant to Article 8 of the Treaty, in the following terms:

> The BIT provides that investment disputes may be referred to ICSID for resolution . . . . Article 8, Section 5 of the BIT provides that the company concerned . . . 'may choose to submit the dispute before . . . the International Centre for Settlement of Investment Disputes.' Accordingly, the Argentine Republic consented to ICSID arbitration as a forum to resolve this dispute. . . . Impregilo has also consented to ICSID jurisdiction over this dispute.[31]

26. In accordance with Article 8 of the Treaty, Plaintiff's submission to arbitration coupled with Argentina's consent set forth in Article 8 constituted an agreement to arbitrate within the meaning of Chapter II of the ICSID Convention.

IV. **The Arbitration**

27. On May 23, 2007, Plaintiff commenced the arbitration by filing and serving a Request for Arbitration on Argentina. The Request for Arbitration invoked Article 8 of the Treaty

---

[29] A true and correct copy of Plaintiff's Request for Arbitration is attached hereto as Exhibit F.
[30] *See* https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx.
[31] Ex. F, ¶¶ 50-52.

9

and Article 36 of the ICSID Convention.[32]  On July 25, 2007, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration.[33]

28.     The arbitration proceeded in accordance with the ICSID Convention and ICSID Arbitration Rules.  The selection of the Tribunal was completed on May 27, 2008.[34]  The Tribunal selected by the Parties consisted of Judge Hans Danelius (President), Judge Charles N. Brower (appointed by Plaintiff), and Professor Brigitte Stern (appointed by Argentina).[35]

29.     Argentina was competently represented in the arbitration by attorneys from Procuración del Tesoro de la Nación ("Treasury Attorney General's office").[36]  Argentina participated in all aspects of the arbitration:  it submitted a Counter-Memorial on the Merits and Memorial on Jurisdiction, a Counter-Memorial on the Merits, a Rejoinder on the Merits, and a Post-Hearing Submission.[37]

30.     The Tribunal conducted a hearing (in which both parties participated and were represented by their respective counsel) on jurisdiction at the ICSID facilities at the World Bank in Washington, D.C., from May 4 to 6, 2009.[38]  The Tribunal then conducted a hearing (in which both parties participated and were represented by their respective counsel) on liability at the ICSID facilities at the World Bank in Washington, D.C. from March 9 to 18, 2010, during which the

---

[32]   Ex. F, ¶ 51.
[33]   Ex. A, ¶ 1.
[34]   Ex. A, ¶ 3.
[35]   Ex. A, ¶ 2.
[36]   Ex. A, ¶ 8.
[37]   Ex. A, ¶¶ 5, 6, 11.
[38]   Ex. A, ¶ 6.

10

Tribunal heard testimony from both Plaintiff's and Argentina's witnesses and experts.[39] The Tribunal closed the proceedings on April 15, 2011 in accordance with Rule 38(1) of the ICSID Convention.[40]

## V. The ICSID Award

31. The Tribunal issued the ICSID Award on June 21, 2011.[41]

32. With regard to jurisdiction, the Tribunal ruled that Plaintiff was an "investor" under Article 1 of the Treaty, as a legal entity incorporated in Italy.[42] Upon Argentina's additional jurisdictional objections, the Tribunal also found that the case could not be dismissed for non-observance of the Treaty's local jurisdictional requirement prior to international arbitration,[43] and that Argentina's objection regarding the contractual rather than treaty nature of Plaintiff's claims was "entirely theoretical" and a ruling on it "unnecessary."[44]

33. On the merits of Plaintiff's claims, the Tribunal found that, though Argentina did not expropriate Plaintiff's investment in AGBA, it failed to treat Plaintiff's investment in a fair and equitable manner because, despite the Argentine legislature "disturb[ing] the equilibrium between rights and obligations in the concession," Argentina "fail[ed] to restore a reasonable equilibrium in the concession, aggravat[ing] its situation to such an extent as to constitute a breach of its duty under the [Treaty]."[45] As such, it was "not necessary to establish whether [Argentina]

---

[39] Ex. A, ¶ 8.
[40] Ex. A, ¶ 11.
[41] *See* Ex. A.
[42] Ex. A, ¶¶ 138, 140.
[43] Ex. A, ¶ 108.
[44] Ex. A, ¶¶ 186-189.
[45] Ex. A, ¶¶ 330, 331, §§ VI(B), VI(C).

impaired [Plaintiff's] investment by unjustified and discriminatory measures or failed to grant full protection and security to the investment."[46]

34.   As compensation for Argentina's breaches of the Treaty, the Tribunal awarded Plaintiff US $21,294,000 (the "Principal Sum"), before interest.[47]   The Tribunal also awarded Plaintiff post-award interest on the Principal Sum, from July 11, 2006 until payment, at an annual rate of 6%.[48]   The Tribunal declined to award any Party legal costs or the costs of the arbitration, instead deciding each Party would bear its own costs for the proceedings and pay half of ICSID's and the Tribunal's fees and expenses.[49]

35.   On October 19, 2011, Argentina filed an application requesting annulment and stay of enforcement of the award.[50]   On March 19 and 20, 2013 a hearing was held in Washington, D.C. before an *ad hoc* committee composed of Mr. Rodrigo Oreamuno (President), Mr. Eduardo Zuleta, and Ms. Teresa Cheng ("Ad Hoc Committee").[51]   On December 18, 2013, the Ad Hoc Committee closed the proceeding in accordance with Rules 38(1) and 53 of the ICSID Convention.[52]   On January 24, 2014, the Ad Hoc Committee unanimously decided to dismiss the entirety of the application for annulment, declare the stay terminated, and order that each Party bear its own legal costs and expenses, Argentina bearing the costs of the proceeding.[53]   In

---

[46] Ex. A, § VI(D).

[47] Ex. A, § VI(E).

[48] Ex. A, § VI(E).

[49] Ex. A, § VI(F).

[50] A true and correct copy of the Decision of the *Ad Hoc* Committee on the Application for Annulment is attached hereto as Exhibit G.

[51] Ex. G, ¶ 12.

[52] Ex. G, ¶ 12.

[53] Ex. G, ¶ 222.

accordance with Rule 53 of the ICSID Convention, once the application for annulment was denied, the ICSID award became final with no further avenues of appeal.

36. The ICSID Award remains unpaid. By this action, Plaintiff seeks recognition and enforcement of the ICSID Award by this Court.

**Cause of Action – Recognition of ICSID Award Pursuant to 22 U.S.C. § 1650a**

37. Plaintiff repeats and realleges the allegations above as if set forth fully herein.

38. The United States is a signatory to the ICSID Convention, which establishes a framework for the resolution of investment disputes between a foreign sovereign party to the Convention and a national of another State party to the Convention. Awards issued pursuant to the ICSID Convention are subject to recognition and enforcement in the United States under Article 54 of the ICSID Convention and pursuant to 22 U.S.C. § 1650a.

39. Argentina signed the ICSID Convention on May 21, 1991, and deposited its ratification on October 19, 1994.[54] The ICSID Convention entered into force for Argentina on November 18, 1994. As the Tribunal found, Plaintiff is a national of Italy, which became a State party to the ICSID Convention on April 28, 1971.[55]

40. Article 53(1) of the ICSID Convention provides that an award rendered by an ICSID tribunal "shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention." The ICSID Award was upheld by the Ad Hoc Committee and is no longer subject to challenge. Thus, pursuant to Article 53 of the ICSID

---

[54] *See* https://icsid.worldbank.org/en/Pages/about/Database-of-Member-States.aspx.

[55] *Id*.

Convention, Argentina is obligated to abide by and comply with the terms of the ICSID Award without any further action by Plaintiff.

41. Article 54(1) of the ICSID Convention provides that "[e]ach Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State."

42. The United States has been a party to the ICSID Convention since October 14, 1966, when the Convention entered into force and Congress enacted enabling legislation in the form of 22 U.S.C. § 1650a, which provides as follows:

> An award of an arbitral tribunal rendered pursuant to chapter IV of the [ICSID] convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the convention.

43. The ICSID Award was rendered by an arbitral tribunal pursuant to Chapter IV of the ICSID Convention.

44. The pecuniary obligations under the ICSID Award consist of the Principal Sum in the amount of US $21,294,000 plus post-Award interest at an annual rate of 6%.

45. Despite Webuild's demands for payment and efforts to negotiate payment from Argentina over the past two years, Argentina has not paid any part of this outstanding pecuniary obligation.

46. Pursuant to 22 U.S.C. § 1650a and Article 54 of the ICSID Convention, the ICSID Award must be recognized and the pecuniary obligations therein must be enforced as if the ICSID Award were a "final judgment of a court of general jurisdiction of one of the several States."

**Prayer for Relief**

WHEREFORE, Plaintiff respectfully requests that this Court enter an order and judgment:

(a) Recognizing the ICSID Award and enforcing the pecuniary obligations imposed by the ICSID Award as if the ICSID Award were a final judgment of a court of general jurisdiction of one of the several States;

(b) Entering judgment in Plaintiff's favor in the amounts specified in the Award, including the Principal Sum of US $21,294,000 and post-Award interest as granted by the Tribunal; and

(c) Awarding such other and further relief as may be proper.

Dated: New York, New York
September 20, 2021

/s/   *James Berger*
James E. Berger (D.C. Bar 481408)
Charlene C. Sun (D.C. Bar 1027854)

**KING & SPALDING LLP**
1185 Avenue of the Americas
New York, NY 11036-4003
Tel: (212) 556 2200
Fax: (212) 556 2222
jberger@kslaw.com
csun@kslaw.com

*Attorneys for Plaintiff*