# Exhibit A

# CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES

---

### TUESDAY, JUNE 28, 1966

House of Representatives,
Committee on Foreign Affairs,
Subcommittee on International
Organizations and Movements,
*Washington, D.C.*

The Subcommittee on International Organizations and Movements met, pursuant to call, at 10 a m , in room 2255, Rayburn House Office Building, Hon. Dante B Fascell (chairman of the subcommittee) presiding.

Mr. Fascell. The subcommittee will please come to order

We are meeting this morning to receive testimony on H R. 15785, a bill to implement the Convention on the Settlement of Investment Disputes. This bill had its origin in an executive communication from the Secretary of the Treasury to the Speaker of the House.

To testify on this legislation there are present the Honorable Fred B Smith, General Counsel of the Treasury, and Mr Andreas F Lowenfeld, Deputy Legal Adviser, Department of State.

At this point, without objection, I will place in the record the bill as introduced, and the text of the executive communication.

(The material referred to follows.)

[H R. 15785, 89th Cong  2d Sess.]

A BILL To facilitate the carrying out of the obligations of the United States under the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, signed on August 27, 1965, and for other purposes

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled* That this Act may be cited as the 'Convention on the Settlement of Investment Disputes Act of 1966."

Sec. 2. The President may make such appointments of representatives and panel members as may be provided for under the Convention

Sec. 3. (a) An award of an arbitral tribunal rendered pursuant to Chapter IV of the Convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U.S.C. 1 et seq.) shall not apply to enforcement of awards rendered pursuant to the Convention.

(b) The district courts of the United States (including the courts enumerated in 28 U.S.C. 460) shall have exclusive jurisdiction over actions and proceedings under paragraph (a) of this section, regardless of the amount in controversy.

The Secretary of the Treasury,
*Washington, May 21, 1966.*

Hon. John W. McCormack,
*Speaker of the House of Representatives,*
*Washington, D C.*

Dear Mr Speaker  President Johnson transmitted to the Senate on February 16, 1966, for advice and consent to ratification, the convention on the Settlement

of Investment Disputes Between States and Nationals of Other States. On May 16, the Senate adopted a resolution of ratification of the Convention. So that the Congress will have before it the Administration's plan for giving effect to the Convention, I transmit herewith a draft bill to carry out the obligations of the United States under the Convention.

The Convention would establish an International Center for Settlement of Investment Disputes (the Center) under the auspices of the International Bank for Reconstruction and Development (the World Bank). The Center would be available on a voluntary basis to settle by conciliation or arbitration investment disputes between private foreign investors and sovereign States in which investments are made.

Section 4 of the bill provides that the President may appoint such representatives to the Center and panel members as may be provided for under the Convention. The Center would have an Administrative Council which would be composed of one representative of each Contracting State and one alternate. The Center would also maintain a Panel of Arbitrators and a Panel of Conciliators and each Contracting State would be entitled to name four persons to each Panel. Section 3 provides that U.S. District Courts shall have exclusive jurisdiction to enforce awards rendered by Arbitral Tribunals under the Convention. It also provides for enforcement of the pecuniary obligations imposed by such awards.

The Secretary of State joins me in submitting this bill to the Congress. It is the belief of both of us that the Convention will add significantly to the legal protection now available for private foreign investment. We recommend enactment of the proposed legislation as soon as possible.

It would be appreciated if you would lay the draft bill before the House of Representatives. A similar bill has been transmitted to the President of the Senate.

The Department has been advised by the Bureau of the Budget that enactment of this proposal would be consistent with the Administration's objectives.

Sincerely yours,

HENRY H. FOWLER.

Mr. FASCELL. Mr. Smith, we will be delighted to hear from you on this subject.

## STATEMENT OF HON. FRED B. SMITH, THE GENERAL COUNSEL OF THE TREASURY

Mr. SMITH. Good morning, Mr. Chairman; I am accompanied by Mr. Harry Gourevitch, senior attorney in the Office of General Counsel.

Mr. Chairman and members of the committee, I am happy to appear before you today in support of H.R. 15785, a bill to implement the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States. I should like to divide my statement into two parts: the first describing briefly the principal features of the convention and the second describing the proposed legislation before you.

The convention establishes under the auspices of the World Bank a Center for the settlement by means of arbitration or conciliation of investment disputes which may arise between private foreign investors of one country and the government of another country. Its primary purpose is to improve the climate for private investment in countries which seek to attract foreign capital, particularly the commercially developing countries, and thus to stimulate a larger flow of private investment into those countries. At the same time, in view of the farflung business activities of our citizens in foreign lands, the convention will be of particular benefit to the United States.

When a private foreign investor normally has a dispute with a host government in the domestic courts of that government, the convention represents the belief that in certain cases it may be more appropriate to bring such a dispute before an international forum. The International Court of Justice is, of course, not available to handle private investment disputes since only governments can be parties before the Court. The convention will establish an international forum to which a private party of one country can take a dispute with the government of another country.

The arbitration and conciliation Center will maintain a Panel of Arbitrators and a Panel of Conciliators from which governments and private investors who have agreed to submit a dispute to the Center either for conciliation or arbitration can select experienced, impartial, and competent arbitrators or conciliators. One of the most noteworthy aspects of the Center is that its jurisdiction will be based entirely on the consent of the parties. No party, either government or private, can be required to submit a dispute to the Center unless it has first consented to do so. Such consent would have to be in writing. A government which ratifies the convention will not by this act give its consent to submit any dispute to the Center. Thus, ratification of the convention by the United States will in no way bind or otherwise commit the U.S. Government to submit any dispute to the Center.

Consent by the parties can be given either at the time an investment is made or after a dispute arises but, once it is given, the convention states that it may not be withdrawn unilaterally. The arbitration mechanism is set up in such a way that refusal by one party to name its arbitrators after it has given its consent to submit a dispute to arbitration would not prevent arbitration from going forward. In such a situation the Chairman of the Administrative Council of the Center can be requested by a party to appoint the arbitrators not yet appointed. Arbitral awards will be binding on the parties and any monetary damages awarded will be enforceable in the courts of any contracting state. The recommendations of a conciliation commission would not be binding on the parties in view of the essentially voluntary nature of the process of conciliation, although the parties to a conciliation proceeding are required to give such recommendations their most serious consideration.

The Center will be located at the headquarters of the World Bank in Washington, D.C., and it will have an Administrative Council which will consist of one representative from each contracting state. The Chairman of the Administrative Council will be the President of the World Bank. Because of the close association of the Center with the World Bank, the Executive Directors of the Bank have agreed to provide the Center with office space free of charge and to underwrite the basic overhead expenditure of the Center for a period of years. In the light of these undertakings, the United States will not be required to make any financial contribution to the Center at the time the United States becomes a party to the convention or in the foreseeable future. The Center will levy a charge for the use of its facilities which will be payable by the parties to an arbitration or conciliation proceeding, and it is possible that in time the Center will become self-supporting.

The convention will enter into force after it has been ratified by 20 countries. Eight countries have already deposited their instruments of ratification, so that 12 more ratifications are needed to bring the convention into force. In addition to the 8 countries which have

already submitted their ratifications, another 35 countries have signed the convention. A list of the signatories and of the countries that have ratified is attached to my statement. The United States is one of the eight countries that have already deposited instruments of ratification and acceptance of the convention. The Senate Foreign Relations Committee unanimously voted out the Convention after having held a hearing on it on March 29 of this year, and on May 16 the Senate, by a unanimous vote of 72 to 0, gave its advice and consent to the resolution of ratification of the Convention.

I shall now turn to the implementing legislation. As I mentioned, the Center will consist of an Administrative Council, which will be composed of one representative from each contracting state. Also, the Center will maintain a Panel of Conciliators and a Panel of Arbitrators, and each contracting state will be authorized to name four persons to each Panel. Section 20 of the bill provides that the President may appoint the U.S. representatives to the Administrative Council and name the U.S. Panel members.

Section 3 of the bill deals with enforcement of arbitral awards. You will recall that the convention provides that arbitral awards rendered pursuant to the convention shall be enforceable in contracting states. Actually, it is only the pecuniary obligations imposed by an arbitral award; that is, the monetary damages assessed against one of the parties, which the courts of a contracting state will be obligated to enforce. Article 54(1) of the convention states.

> Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

The purpose of section 3 of the bill is to implement article 54(1) of the convention. Section 3(a) states that the pecuniary obligations imposed by an arbitral award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. To give full faith and credit to an arbitral award as if it were a final judgment of a court of one of the several States means that an action would have to be brought on the award in a U.S. district court just as an action would have to be brought in a U.S. district court to enforce the final judgment of a State court. In such an enforcement action, the district court would be required to give full faith and credit to the arbitral award. Essentially, this means that the district courts would be precluded from inquiring into the merits of the underlying controversy.

Section 3(a) also states that the Federal Arbitration Act shall not apply to the enforcement of arbitral awards rendered pursuant to the convention. The Federal Arbitration Act is not an appropriate instrument for enforcing arbitral awards rendered pursuant to the convention. For example, section 9 of that act provides that an arbitral award may be confirmed in a court judgment, but only if the parties in their agreement had agreed that a judgment of a court shall be entered upon the award, and then the judgment may be entered only by the court specified in the agreement of the parties or, if no court is specified, by the Federal court "in and for the district within which such award was made." This section does not fit the

convention, which provides for enforcement of awards in the courts of a contracting state regardless of whether judicial enforcement was specifically provided for in the agreement of the parties and also regardless of the place where the arbitral award was rendered. Moreover, the Federal Arbitration Act would permit the courts to vacate an arbitral award on certain grounds, such as the corruption of one of the arbitrators, which under article 52 of the convention ought to be raised through the annulment proceedings provided for in the convention.

Section 3(b) of the proposed legislation states that district courts of the United States shall have exclusive jurisdiction over actions to enforce arbitral awards. This provision is also based on article 54(1) of the convention, which states that in the case of Federal states like the United States arbitral awards may be enforced in or through the Federal courts. The statement that the jurisdiction of district courts shall be exclusive means that arbitral awards shall be enforcible in Federal courts and not in State courts.

In conclusion, Mr. Chairman, I strongly urge favorable consideration of H.R. 15785 so that the United States will be in a position to implement its membership in the arbitration and conciliation facility. This completes my statement, Mr. Chairman. I shall be glad to try to answer any questions.

(The signatories mentioned in Mr. Smith's statement follow.)

SIGNATURES AND RATIFICATIONS OF THE CONVENTION AS OF JUNE 23, 1966

The following 35 countries have signed the convention.

| | |
|---|---|
| 1. Pakistan | 19. Belgium |
| 2. Jamaica | 20. France |
| 3. Niger | 21. Congo (Brazzaville) |
| 4. Upper Volta | 22. China |
| 5. United Kingdom | 23. Togo |
| 6. Morocco | 24. Federal Republic of Germany |
| 7. Ethiopia | 25. Greece |
| 8. Cameroon | 26. Cyprus |
| 9. Japan | 27. Liberia |
| 10. Sweden | 28. Dahomey |
| 11. Somalia | 29. Korea |
| 12. Sierra Leone | 30. Chad |
| 13. Nepal | 31. Austria |
| 14. Luxembourg | 32. Kenya |
| 15. Denmark | 33. Netherlands |
| 16. Malaysia | 34. Malagasy Republic |
| 17. Italy | 35. Malawi |
| 18. Ghana | |

The following 8 countries have ratified the convention:

| | |
|---|---|
| 1. Nigeria | 5. Gabon |
| 2. Mauritania | 6. United States |
| 3. Central African Republic | 7. Uganda |
| 4. Ivory Coast | 8. Tunisia |

Mr. FASCELL. Thank you, Mr. Smith.

Before we begin our questions, let us hear from Mr. Lowenfeld on behalf of the Department of State:

## STATEMENT OF ANDREAS F. LOWENFELD, DEPUTY LEGAL ADVISER, DEPARTMENT OF STATE

Mr. LOWENFELD. Thank you, Mr. Chairman and members of the committee

I am pleased to appear before this committee on behalf of the Department of State in support of H.R. 15785, a bill to facilitate carrying out the obligations of the United States under the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States.

The purpose of this legislation, as the name implies, its to facilitate carrying out U.S. obligations under the World Bank Convention. The U S instrument of ratification was deposited on June 10, 1966, following the advice and consent of the Senate by a uuanimous vote on May 16, 1966

The United States became the seventh country to deposit its ratification with the World Bank Altogether, 8 countries have now ratified the convention, and 35 others have signed it and are in various stages of their ratification process. It is interesting to note that of these countries 31 are capital importing and 12 are capital exporting. The major free world capital exporting countries—United States, United Kingdom, Germany, France, Italy, Belgium, Japan—are signatories to the convention. Of the less developed countries the convention has found general acceptance in Africa. In Asia and Latin America, the convention has not yet been widely accepted, but nearly all free world countries participated in the preparatory work and it is hoped that the convention will gradually be accepted as experience is gained with it.

The basic purpose of the World Bank Convention, as already described by Mr. Smith, can be carried out without implementing legislation. The International Center for Settlement of Investment Disputes will be established as soon as the required number of states have ratified the convention—that's 20. Since the administrative arrangements will be handled through the World Bank, no appropriation will be required. The machinery for settling disputes under the convention—whether by conciliation or arbitration—will be set in motion by virtue of consent by two or more parties. The principal purpose of the legislation we are seeking here looks farther down the road—that is, to enforcement of arbitral awards rendered pursuant to the convention By enacting this legislation, the United States would be assuring compliance with article 54 of the convention, which is designed to give force to the principle that arbitral awards shall be binding on the parties.

I will come back later to the specific purposes of H.R. 15785. First, however, I think it will be useful to give the committee some idea of the advantages we foresee for the United States from adherence to the convention.

Essentially, the Department of State believes the convention will constitute another step forward—modest, but nevertheless significant—toward our goal of improving the international investment climate. The World Bank Convention, like the investment guarantee program operated by the Agency for International Development is founded on the belief that an important component of favorable investment climate is the confidence on the part of investors—

and on the part of host countries as well—that disputes between investor and host government can be settled in an orderly and impartial manner.

One of the deterrents to private capital investment in less developed countries has been the fear that the investment will be expropriated or will be made subject to burdensome conditions not anticipated at the time of the investment. On the other hand, capital importing countries have been anxious to safeguard what they regard as their sovereign freedom of action with respect to foreign investors, as with any other persons doing business within their countries Governments have in some instances been unwilling to give the kinds of assurances required by international investors. By providing a mechanism for impartial resolution of disputes between investors and host governments the World Bank Convention will provide, in a real sense, a meaningful assurance of fair treatment for investor and host country alike It will provide an international forum for disputes that are half way between government to government disputes and disputes subject to adjudication in the courts of a single state. This, Mr. Chairman, is perhaps the convention's greatest innovation

The World Bank Convention does not lay down any substantive rules regarding investment, responsibility of states to alien property holders, due compensation for taking, and the like. The judgment of the World Bank, in which we concur. is that any attempt to lay down such rules could not have won the substantial support this convention has found among the less developed states However, it is anticipated that decisions through the convention's mechanism will create a significant new body of international law. Thus international law in this area can be expected to grow through this convention, without the restriction of the traditional principle that only states and not private parties are the subject of international law, and without requiring an advance consensus on the legal principles involved

" As the country with the greatest amount of international investment, and the greatest stake in the development and wide acceptance of international law standards regarding protection of private property, the United States stands to gain substantially from the convention. Moreover, if the convention facilities do lead, as we expect, to increased investment by Americans and others in the less developed countries, this will benefit in an important way our overall objective of international economic development and will complement our foreign assistance programs and related activities.

Mr. Chairman and members of the committee, Mr. Smith has already outlined the convention's scope and perhaps what I am about to say will lead to a certain amount of repetition. Nevertheless, I should like to emphasize a few points about the convention, which seem noteworthy from the point of view of the Department of State.

First, as to the voluntary nature of the convention Aside from the principle of international settlement of disputes between individuals or companies and states, the most important principle of the convention is that the settlement of disputes shall be completely voluntary. Thus the United States, by adhering to the convention, has not bound itself to resort to the convention's procedures—conciliation or arbitration·· in any given case. Nor would any American

investor bind himself to resort to the convention's procedures by investing in a country party to the convention. The convention would simply offer the facilities for an impartial settlement of a dispute if and when the parties agreed to such settlement.

Consent to use these facilities would be given in two ways. (1) after a dispute has arisen, the investor and the host country may agree to submit a dispute to conciliation or arbitration, or (2) the investor and the host country may agree in advance, in an investment contract or in a separate instrument, that all disputes or all disputes of a certain character shall be submitted to conciliation or arbitration in accordance with the convention's rules. What adherence to the convention signifies is agreement on the general principle that investment disputes are to be settled in an orderly and amicable way. Further, the existence of the convention is expected to provide a helpful point of reference for potential investors and host countries in discussing in advance what is to be done if difficulties develop in the proposed investment.

Second, as to disputes subject to the convention. By terms of article 25(1), the jurisdiction of the Center is limited to a "legal dispute arising directly out of an investment." As a practical matter, we expect arbitration and conciliation to be accepted only for disputes over the extent or nature of legal rights or the compensation to be made for breach of a legal obligation. The term "investment" is not defined in the convention. This was intentional. If two parties to a dispute agree to submit to the jurisdiction of the Center, it was thought there should be no rigid definitions of investment to oust the Center of jurisdiction. The term "investment dispute" is used only to make clear that ordinary commercial disputes are not intended to be covered. In case of a doubt, the tribunal would be the judge of its own jurisdiction.

Third, as to parties to the dispute. Article 25(2) requires that one party be a contracting state, or one of such a nation's designated subdivisions or agencies, and that the other party be a national of another contracting state. Thus, neither intergovernmental disputes, nor disputes between a government and its own nationals, are within the jurisdiction of the Center. There is one exception, and that is for corporations or other legal entities which the parties agree should be treated as foreign for purposes of the convention. Thus, for example, a subsidiary of a U.S. firm could be treated as a U.S. national, even if, for other reasons, it was locally incorporated.

Fourth, as to arbitration as exclusive remedy. The convention states that all agreements to arbitration under the convention, unless the parties provide otherwise, shall be exclusive of any other remedy. All awards shall be final and binding. There is a limited provision for review of the award by the tribunal itself or by the Center in the event of certain irregularities, but basically arbitration under the convention's rules is intended to be a self-contained and definitive resolution of a dispute. By becoming parties to the convention, states bind themselves to honor awards rendered pursuant to the convention, regardless of who the parties were to that arbitration. Thus even if the arbitration was, for example, between a Canadian company and the Government of, say, Nigeria, an award would be binding and enforceable in the United States.

Let me turn now, Mr. Chairman, to the reasons for the legislation which we are discussing here.

As I have stated, the need for the legislation proposed here is limited to enforcement of arbitral awards. We have thought that such enforcement should be as simple as possible. Both parties to an arbitration should be entitled to rely on an award as dispositive of the dispute between them; where a monetary award is rendered and the party ordered to pay has funds in the United States, the prevailing party should be able to resort to U.S. courts to collect on the award, if that becomes necessary.

By making provision for the enforcement of awards in the United States, this bill would comply with the articles of the convention relating to recognition and enforcement of awards (arts. 53–55) and in particular with the obligation set forth in article 54, which Mr. Smith has read.

Subsection 3(a) of the draft bill does three things.

One, it provides that the pecuniary obligations imposed by an arbitral award rendered pursuant to the convention shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several states. Article 54(1) of the convention limits the obligation to enforce such an award to the monetary damages included in that award. In other words, if an award were to say that a country must reinstate certain employees that had been discharged wrongfully and that were somewhere else, not in the United States, you could not obtain specific performance of that part of the award in a U.S. court pursuant to this legislation. But, if there were an order to pay $x$ dollars, that would be subject to enforcement pursuant to the legislation we are seeking here to implement the convention.

Mr. ROSENTHAL. If I may break in, Mr. Chairman. On page 8, that last sentence of the paragraph 4; in other words, if the arbitration award involved a Canadian company and, say, another country, Nigeria, do you mean that the U.S. courts would have jurisdiction to enforce that arbitration award?

Mr. FASCELL. Mr. Lowenfeld?

Mr. LOWENFELD. Yes, that is correct.

Mr. ROSENTHAL. Is that really our intention here?

Mr. LOWENFELD. Yes. This was discussed in some length, both in the preparatory work leading to the convention and in drafting this legislation. The idea would be that the awards rendered by the convention, by a tribunal pursuant to the convention, are final and binding, as to all parties to the convention. There might be some defense, but leaving those aside why should not such an award be treated like a judgment and accorded validity wherever the losing party can be found?

Mr. ROSENTHAL. The only reason I can see is that it would place a burden on our courts.

Mr. SMITH. I might point out that the plaintiff might be a Canadian subsidiary of a U.S. company.

Mr. ROSENTHAL. Aside from that, you are opening up our courts, the first time in my knowledge, to foreign nationals who otherwise would not have the right to come into that court.

Mr. LOWENFELD. No. For example, let's suppose a British plaintiff has a claim against a Nigerian entity, forgetting about the Convention; let's say he gets a judgment in London or Lagos. He could come with that judgment to the United States. It wouldn't have full faith and

credit but the forum would be open to him and he could seek to enforce it.

Now, the theory here is we have an international system of acceptable adjudication. That's accepted and if funds happen to be in the United States, why he could enforce it here

It may also work the other way around. An American plaintiff, for example, might go to London where, let's say, Nigeria, would have some funds available. It is true that all the centers of international commerce—Great Britain and the United States obviously being the leading ones—will to some extent be available. But it makes it simpler to enforce, and the idea is that the principle will give maximum value to the award rendered pursuant to the convention.

Mr. FASCELL. In reference to Mr. Rosenthal's question, our courts are now open to foreign nationals under other existing laws, so it is still subject to the normal defenses that will accrue under international law.

Mr. GROSS. How about an American claim being settled in a Ghanaian court?

Mr. LOWENFELD. If an American claim is settled in a court in Ghana and he tries to collect it in the United States, then the Ghanaian judgment would not be entitled to full faith and credit. It would be entitled to limited recognition and there would be a number of defenses available, including the defense whether there was proper jurisdiction. But, if the claim of the U.S. investor, let's say, against the Ghanaian Government had been adjudicated pursuant to the convention here, then presumably all the issues of jurisdiction and fairness, notice, and opportunity to present the case would have been decided

Mr. FASCELL. Let's state that another way, if we can.

Mr. SMITH, does the convention or the legislation change substantive law?

Mr. SMITH I don't think the legislation changes the substance of the law. The convention may in the sense that the arbitral award is treated as a judgment which it might not be absent the convention.

Mr. FASCELL. Any two parties can agree in a dispute that they are going to be bound, and this forces an effective judgment and therefore the substantive law is not changed

Mr. LOWENFELD The substantive law, Mr. Chairman, if I may comment on Mr. Smith's answer, the substantive law, that is to say, the rights and obligations between an investor and a host government are not changed by this convention.

Mr. FASCELL. Thank you.

Would you proceed now with the rest of your statement?

Mr. LOWENFELD. As I was saying, the primary object of subsection 3(a) of the draft bill is to make an arbitral award rendered pursuant to the convention entitled to the same full faith and credit in a Federal court of the United States as that given a final judgment of a State court.

Second. The award of an arbitral tribunal under the convention is to be given the status of a right arising under a treaty of the United States Article III, section 2, clause 1 of the Constitution extends Federal judicial power to cases arising under the Constitution and laws of the United States and to treaties made under their authority, and this bill simply makes clear that action on arbitral awards under

the convention fall into the latter category for purposes of Federal court jurisdiction.

Third Finally, the bill provides that the Federal Arbitration Act shall not apply to enforcement of arbitral awards made under the convention. The Federal Arbitration Act, as we have heard Mr Smith say, permits courts to vacate an award on grounds of corruption, fraud, partiality, misconduct, or other prejudicial conduct of an arbitrator, or where arbitrators exceed their powers. Under article 52 of the convention, however, such challenges to an award may be made only through the annulment proceedings provided for in the convention. Section 3(a) of the bill, therefore, makes clear that the inconsistent provisions of the Federal Arbitration Act will not apply

Section 3(b) of the bill would give U.S. district courts exclusive jurisdiction over actions to enforce arbitral awards under the convention Article 54(1) of the convention provides that a contracting state that is a federal state may meet its enforcement obligations through its federal courts. The United States suggested this provision in order to be able to provide in the United States for a uniform procedure for enforcement of awards rendered pursuant to the convention Under the bill, jurisdiction of the Federal courts would therefore be "exclusive." The Federal district courts of the Panama Canal Zone, Guam, and the Virgin Islands are given jurisdiction of enforcement actions through reference to 28 U.S.C. 460, which includes those courts with the district courts of the 50 States.

Let me go very briefly over the other provisions of the bill They are merely housekeeping provisions. The first section provides a statutory title, and the second relates to a provision in the convention under which member countries may appoint representatives to the Administrative Council and may designate four persons each to the Panel of Conciliators and the Panel of Arbitrators.

Under section 2 of the bill, the President would make these appointments and designations.

That concludes my statement Mr Chairman.

Let me just say that the Department of State urges the prompt enactment of the bill before you. We expect that this legislation will contribute to the expeditious settlement of those investment disputes which are submitted to arbitration under the World Bank Convention. Enactment of the legislation will be further testimony to the support by the U.S. Congress for orderly and judicial procedures for peaceful settlement of international disputes.

Mr. FASCELL. Gentlemen, who will pay the Panel members selected by each signatory country?

Mr. SMITH. They will not be salaried. They will be paid when they serve, and it is contemplated that a charge will be made among the parties to the conciliation or arbitration proceedings to cover the expenses.

Mr. FASCELL. In other words, office space and administrative overhead will be provided by the World Bank, and the participants the arbitrators or the conciliators, will be paid out of a fee charged to the parties involved in the arbitration or the conciliation.

Mr. SMITH That is correct.

Mr. FASCELL Mr. Gross?



Mr. Gross. In your conclusion, you urge prompt enactment of the bill because it is expected to contribute to expeditious settlement of investment disputes submitted to arbitration. Are you having any difficulty and, if so, what kind of difficulty? Do you have a record of disputes now? If so, what are some of them? Give us some examples of a dispute or two that you have.

Mr. Lowenfeld. Mr. Chairman, it is hard in the abstract to say whether any given dispute that we now know of would be solved if this convention were in force because in each case the government and the investor would have to agree, but certainly——

Mr. Gross. Let me put it another way.

What prompts the necessity for this legislation, unless you have some disputes that are not now being settled?

Mr. Lowenfeld. We have a number of cases. For example, I could just refer briefly to the disputes that various American oil companies have had with the Argentine Government, for instance, Peru, and Iraq. American investors have had difficulties with the Governments of Ceylon and Indonesia. We have had—I think this committee is well aware of a number of instances.

Some of them are big and get the headlines and some of them are small. Some come into our embassies and some don't come to our attention at all.

Mr. Gross. Well, have they been settled?

Mr. Lowenfeld. Some of them are in various processes of adjudication and negotiation. Some have been settled; for instance, I refer to Ceylon, the oil companies in Ceylon and the Government, the new Government of Ceylon have reached agreement for compensation; recently the rubber companies and new Government of Indonesia have reached settlements.

There are a good number of smaller disputes that are pending I might say, Mr. Gross, that we are looking not just to existing problems that we know about and that are probably too late to come under the convention. We have noticed in the past few years that the flow of private investment to the less developed countries, which is essential to their development, has not been as fast as it might be, and it has been not only our judgment, but the judgment of the World Bank and international community in general that one of the reasons for this has been the fear that there might be not necessarily expropriation, but governmental actions that were uncalled for and there would be no satisfactory way for them to be settled. The hope is that through this convention investors and potential investors can in advance make provisions for orderly settlement of disputes that may arise.

The disputes may not all be one way. Sometimes host governments think, for instance, that investors don't fulfill their obligations to train local employees and put them into administrative positions, and the like.

Mr. Gross. You are not going into that field, are you?

Mr. Lowenfeld. Well, if a company, let's say, is contemplating investment in country z, it may want to work out an investment agreement that may involve certain land or power facilities. It may involve some tax rebates or forgiveness. On the other hand, the investor may agree to, let's say employ a certain number of local employees or to give training, set up schools, to produce a

amount of the commodity for export to provide housing, anything like that.

Now, any article in such an investment agreement obviously can be subject to misunderstanding or dispute. The question is how should such a dispute be settled? Either party may fail to fulfill such an obligation or may think the other one has failed, and the thought would be that here you have an impartial facility——

Mr. Fascell. Would you stop at that point and tell us what happens under the present law if the dispute arises under that hypothetical case?

Mr. Gross. That's right. In other words, what is there that you can do with this legislation in the absence of which you cannot do? I'm not at all satisfied that I know what you can do with this legislation that you cannot do without it.

Mr. Lowenfeld. What Mr. Smith and I really have been talking about, Mr. Gross, is not so much the legislation as the convention itself. The legislation is simply a supporting actor in this play. The basic play is the convention itself which the United States has already ratified.

Mr. Smith. Could I add a comment to that. I don't know whether this will be helpful. It seems to me ultimately that the U.S. investor is going to be reduced to taking the best deal he can make after the property has been taken over under the existing situation. He really doesn't have any court of law that he can go to if he is unsatisfied with the award that he gets.

Now, in the same situation of a new investment where there was an agreement that could be covered by the convention, you could have an advance consent to submit any dispute to arbitration. Particularly in situations where the political atmosphere might be such that you couldn't have an objective and really amenable negotiation on the fair value for the property you would under the convention have gotten the thing into the hands of competent, independent arbitrators, who can come out with a fair award—fair to all parties concerned. I think that is something that can be done under this convention, which in situations that have arisen in the past wouldn't be done.

Mr. Gross. Let me ask one question and then my time has expired, I'm sure.

Is this one more step in the fatal road toward world government?

Mr. Smith. I would say not, sir, because it is fundamentally based on the consent of the parties.

Mr. Lowenfeld. I would turn the question around, Mr. Gross: I'd say it is one more step in the direction of the development of international law.

Mr. Fascell. The main thing that cannot be done under this convention, or rather that can't be done now, is for an investor to go into a new country and reach an agreement in advance—where the country will be bound by arbitration under the original investment agreement. Thus an investor now cannot get, and therefore if he has a dispute with the host government, his only recourse is through a process of negotiation; isn't that true?

Mr. Smith. Roughly, yes.

Mr. Lowenfeld. I don't want to sell short local courts.

Mr. Fascell. Well, I'm not selling them short, either.

This is the big advantage. You can drive a bargain when you first go in there, to get an agreement with the government to negotiate and conciliate, whereas now you don't have a chance. You are completely at their mercy.

Mr. Gnoss. Can't you do that without this legislation?

Mr. Fascell. There was no recourse until the time we had this convention, there have been no mechanics for carrying out our obligations under the convention we have ratified, and this legislation implements the convention.

Mr. Smith. You can agree to arbitrate separate from this convention in an investment agreement, but the problem there is enforceability and also all the defenses that can be raised. Now this sets up a procedure and ground rules for the implementation of an award.

Mr. Gnoss. But Mr. Lowenfeld said that the most important principle is that settlement of disputes shall be completely voluntary.

Mr. Lowenfeld. That you volunteer now.

Mr. Fascell. The parties have to consent to be bound.

Mr. Smith. Once they agree, they are bound.

Mr. Lowenfeld. Let's say the best government wants the investment——

Mr. Gnoss. We can say they can agree in the absence of this. You have no machinery for enforcement. What are you going to do, wage war to force a settlement?

Mr. Lowenfeld. No. We don't think this is the millenium, but as I said in my statement, this is a step forward.

Mr. Fascell. Mr. Roybal?

Mr. Roybal. You were saying under this bill once it is approved that an individual making an investment can make a deal in advance, that he would be protected under this bill. Now, where is that indicated in this bill?

Mr. Fascell. It is in the convention.

Mr. Roybal. Oh, not in the bill.

Mr. Fascell. It is in the treaty or convention that has already been ratified.

Mr. Roybal. I misunderstood it because I thought the difference would be the bill now before us and it is actually in the convention itself.

Mr. Smith. It is in the convention. The bill is merely in implementation of the convention that has already been ratified, just to clarify it.

Mr. Fascell. It gives the Federal courts jurisdiction to determine the nature of the award.

Are there any other questions?

Mr. Roybal. That is all.

Mr. Fascell. Mr. Frelinghuysen?

Mr. Frelinghuysen. Thank you, Mr. Chairman.

I would like to begin by asking a couple of questions about the bill which you introduced, which apparently has some typographical errors. I see no section 1, and no section 3, both of which are referred to by our witnesses this morning.

Mr. Smith. Section 1 is the enactment clause, but in the first line of section 3, if you compare S. 3498, you will see that there is a printing error there.

Mr. Frelinghuysen. Has the Senate already taken action?

Mr. Fascell. No sir

Mr. Frelinghuysen. Then in section 3(b) "Districts" should be plural? Looking at the Senate bill, I can answer my own question. It should be plural

Mr. Fascell. These are printers' mistakes, Mr. Frelinghuysen, and they will be corrected. A new print of the bill is coming out.

Mr. Frelinghuysen. I would like to ask you, Mr. Smith, what sort of agreement the World Bank has made regarding the office space and underwriting expenses for a period of years. Have they entered into a formal agreement which binds them to assume certain obligations? If so, for how long and with whom do they enter into such an obligation?

Mr. Lowenfeld. They signed the convention—the Bank signed the convention and agreed to assume the obligations stated therein.

Mr. Smith. But, not for any fixed period. In other words, they haven't bound themselves for eternity. They said for an indefinite period we will provide the office space

Mr. Fascell. Without objection I think we should have a copy of the convention for the record.

Mr. Frelinghuysen. We talk so much about something that is not before us, that would be a good suggestion

Is this a formal part of the convention that the World Bank binds itself to us as a signatory to meet certain requirements for office space and also to meet basic overhead expenditures?

Mr. Smith. It is not in the convention itself. It is in the report of the Executive Directors. Along with the convention there was a report of the Executive Directors that went with it.

Mr. Frelinghuysen. The Executive Directors of the World Bank?

Mr. Smith. Yes

Mr. Frelinghuysen. And, this report that formally pledged the World Bank to assume certain obligations with respect to space and expenditures?

Mr. Smith. Let me find it so I can tell you exactly.

Mr. Frelinghuysen. It isn't of earth-shaking importance. I just wonder what sort of obligation had been assumed, and if it is in any form that can be considered assurance.

Mr. Smith. I don't have the answer to that handy, but they have made that undertaking and if you would like, I will supply it for the record

Mr. Fascell. Will you supply for the record, Mr. Smith, details on how the World Bank has made that undertaking?

Mr. Smith. I shall be happy to [2]

Mr. Frelinghuysen. I'm not sure I understand, referring to Mr. Lowenfeld's statement on page 8, about the nature—and I suppose the convention clarifies this—the nature of the review provided of these arbitral awards. We certainly are trying to make these awards final, as I understand it. The intention is trying to make them binding on ourselves or any signatory to the convention, so it would seem to me wise that there be some reasonable review.

Is there a reasonable review, or in effect is this a decision from which there is no effective appeal?

[1] The text of the entire item appears in appendix I, p. 29.
[2] The text of the Report of the Executive Directors of the International Bank for Reconstruction and Development Bank appears in appendix III, p. 30.

Mr LOWENFELD Basically there is no effective appeal from an award except for certain stated grounds. They are stated in article 52 of the convention, and such grounds are that the tribunal was not properly constituted, that it manifestly exceeded its powers, that there was corruption on the part of a member of the tribunal, that there has been a serious departure from the fundamental rules of procedure, or that the award failed to state the reasons on which it is based.

And, then article 52 goes on to say, to set a time period and it is a relatively short time period, 120 days, on which grounds for revision of the award, one of these grounds may be raised Then there are some procedures, some rules spelled out for how you raise these points

For instance, if you allege corruption, the Chairman—Chairman of the Administrative Council—also President of the World Bank, shall appoint an ad hoc committee of three persons and these three persons shall be of different nationality from the members of the original tribunal. And then they have certain authority to annul or confirm the award

All of this is spelled out in article 52—51 and 52, actually. There are also certain limited grounds for reopening the issue if new facts have been discovered which are material to a decision of the case and which you couldn't have known before and it wasn't your fault that you didn't know.

Mr. FRELINGHUYSEN. We don't have article 52 before us, but if we had it before us, we wouldn't have the ability to digest it instantaneously. I don't want to see it; I am sure it is fairly detailed.

What I am worried about is whether article 52 is not severely limited compared to the remedies under the Federal Arbitration Act. I realize that the Federal Arbitration Act is not applicable, but it would seem that the substitute remedy in article 52 might be far less generous with respect to setting aside of an award that has been made.

In other words, a time limit of 120 days sounds like quite a restriction on the ability to challenge these awards.

Mr. LOWENFELD. The experience over the years has been, Mr. Frelinghuysen, that international arbitration takes an inordinate amount of time and that the party that doesn't want to play the game has various opportunities for delay

The purpose of this provision in the convention is that once an arbitration is under way, goes from beginning to end in an orderly and expeditious manner, so that, for instance, if a party decides well, I may have given my consent but, I am not going to appoint an arbitrator or I am not going to show up and give my side of the case, that doesn't defeat the arbitration; similarly the grounds of fraud, corruption, and excess of powers are supposed to be limited so that there can be an end to the arbitration

I think it is fair to say that on merits the defenses of the Federal Arbitration Act and the defenses in article 52 are comparable if not exactly alike. :

The idea is that they should be decided by the same body and under the same auspices. You don't want to give another body, it is not just in the United States, it may be the court in Uganda that you are trying to move on the award, but you don't want to give another judicial body a crack at deciding the merits of the case.

Mr. FRELINGHUYSEN. Mr Smith you described the process under article 52 ___ one that ought to be used if there should be corruption

of one of the arbitrators on page 6 of your statement Would it not have to be raised? Is this not the only way in which one could raise a question about corruption of one of the arbitrators or the only way one could challenge it?

Mr. SMITH. That is right.

Mr. Frelinghuysen. I think I have the answer to your previous question.

The Executive Directors put forward with this convention a report and they also adopted a resolution approving the report. Paragraph 17 of the report says:

With respect to the financing of the Centre (Article 17), the Executive Directors have decided that the Bank should be prepared to provide the Centre with office accommodation free of charge as long as it sent at the Bank's headquarters and to underwrite, within reasonable limits, the basic overhead expenditure of the Centre for a period of years to be determined after the Centre is established.

So, that is in the report that went with the convention to the various countries, and this report was approved by a resolution of the Board of Directors of the World Bank

Mr. FRELINGHUYSEN Then your statement of what the World Bank has assumed in the way of responsibilities is an accurate paraphrase of what they actually assume? The resolution does not really tell us for how long or how much of an obligation?

Mr. SMITH. That is right.

Mr. FRELINGHUYSEN. But, a relatively small amount is involved, I assume

Mr. FASCELL. Mr. Fraser?

Mr. FRASER. Thank you, Mr. Chairman.

In Peru there was a dispute between a subsidiary of Standard Oil and the Peruvian Government on a possible expropriation Is that the kind of dispute that would be amenable to this procedure?

Mr. LOWENFELD Well, it might be

Mr. FRASER. This involved a threatened executive action rather than a judicial question, I gather.

Mr. LOWENFELD I think it would fall within the definition of an investment dispute. As you said, it was a mixed political, legal matter. There was also the issue of whether an earlier arbitral award rendered in the 1920's was or wasn't governing. I think if the two parties were to agree to submit the dispute to the convention's procedures, it could be done. You might have to narrow down somewhat what the dispute is. For instance, it might be that, let's say, Peru were to pass a law to nationalize the properties and, say, offer $20 million to be paid in local bonds and the investor, Jersey Standard Co., might say it is worth $80 million. It might be that the panel of arbitrators would be asked to pass on the obligation to make compensation. So it is possible.

Whether in the specific case this would be done, it is very hard to see, because it is an existing dispute, with a great long history behind it

Mr. FRASER. What about the question that was presented to our committee a year or two ago with respect to enforcement of judgments against sovereign nations? How does this tie in?

For example, I noticed that this, I forgot what point these rules are called into play so as to prevent a matter going forward in court

er not, but in any event can you just characterize that the answer to that question

Mr Lowenfeld   It is a good question and it was raised during the negotiation of this convention.

Article 55—the one immediately following the article that Mr. Smith and I have been talking about—says

Nothing in Article 54—

as to the enforceability of the arbitral award—

shall be construed as derogating from the law in force in any contracting State relating to immunity of that state or of any foreign State from execution

That means suits on arbitral awards in the United States will be tied to the U S practice  That practice may be changing from time to time with different courts deciding the applicability of sovereign immunity rules  As you recall the committee had something to do with legislation on that score last year, and it may change from time to time

Basically what this convention says is that the district court shall have jurisdiction over the subject matter.  As to whether it has jurisdiction over a party, there is nothing in the convention that will change the defense of sovereign immunity.

If somebody wants to sue Jersey Standard in the United States, on an award, no problem

If somebody wants to sue Peru or the Peruvian Oil Institute, why it would depend on whether in the particular case that entity would or would not be entitled to sovereign immunity

As far as the United States goes, probably if the United States were a defendant, it consents by this treaty to be sued on an award if it hasn't paid it.

Mr. Fraser  Well, would the agreement leading to the arbitration itself reach that question?  For example, supposing the Peruvian Government was a party  is it contemplated in the consent to have the matter decided by arbitration, that this is a consent that all of the other normal processes of enforcement and execution of judgment could take place without raising a separate defense?

Mr Lowenfeld  No, I don't think so.  It is possible that you might try to write something in an investment contract, but probably you would not.

The thought is that if an investor and the government agreed to settlement of disputes through arbitration under the convention, that the government has obligated itself in a treaty to honor the award.  You don't look to the situation where the government says try and collect, since typically the performance of an award would be in the country against which it is rendered

It is possible to do what you suggest, but it is not necessarily anticipated.

Mr Fraser.  My last question is, how does this relate to the arrangements which are in the agreements that we entered into with AID recipient countries with respect to investment guarantees.  There is a provision in there requiring that the recipient country agree to some kind of proceeding in the event of dispute  How does this relate to that?

Mr Lowenfeld  It is a different mechanism.  The investment guarantee procedure is a procedure for subrogation where the U S.

Government Agency for International Development insures, and in certain event pays for certain specified risks.  It then assumes the rights that the American investor had vis-a-vis the other government, and in certain circumstances that are defined there is provision for a government to government arbitration.

Mr. Fraser.  That encompasses that.

Mr. Lowenfeld.  This is rather different  First of all, the risk might be quite different.  It can be labor disputes, either side can be a plaintiff or defendant and it tries to take the dispute out of the government to government confrontation.

Also, this is not an insurance policy.  The investment guarantee agreement we have been talking about costs money to the investor.  He has to pay a premium for insurance.

Mr Fraser  I am just thinking of the remedies that are open.

Mr. Lowenfeld.  They are different.  To some extent an investor might want to decide which one he wishes to resort to or, if he wishes, to resort to both.  But, the convention contemplates a private-to-government arbitration.

Mr. Fraser.  Thank you, Mr. Chairman.

Mr Fascell.  And in no way then does the treaty abrogate any of the rights that would accrue under an investment contract even though it originally is a private investor to a government dispute because the subrogee can be in no better position than the original person.

Mr. Lowenfeld.  That's right  However, the convention does provide, let's say the U.S Government could not pay off a U.S. investor, then say I'm subrogated to your rights, now, I'm going to be a party to this arbitration.  That is ruled out

Mr. Fascell.  Mr. Rosenthal?

Mr Rosenthal  Thank you, Mr Chairman.

Why did you submit this legislation before 20 countries had ratified the convention?

Mr. Lowenfeld.  We thought—perhaps you want to answer that.

Mr Smith.  Yes.  Article 69 of the convention requires each contracting state to take whatever legislative measures are necessary for making the provisions of the convention effective in its territories  Also, we are anxious to have this come into effect as soon as possible while the process of signing and ratification on the part of other countries is proceeding.  We would like very much to see this legislation enacted at this session of Congress  We feel that moving promptly in this way will be a further demonstration of the intent of the United States to go forward with this convention and that it will serve as a further impetus to the ratification process of other countries, especially these 35 countries which have already signed but not yet ratified the convention

Mr. Rosenthal.  One other question.  As to procedure, how does this work?  The President will nominate the panel members.  I assume each of the ratifying countries will nominate the same number of panel members.

Mr Smith.  Up to four each

Mr Rosenthal  Now, with regard to the disputes, do they have a choice as to which panel members they want under the terms of the convention?

Mr Smith  Yes, sir, they do.

They select. However, the majority of the members of the panel may not be nationals of either party to the dispute. The Chairman, the President of the World Bank, also selects 10 members of the panel under the convention as well as each member country selecting 4, and these 10 must be from 10 different countries

Mr. ROSENTHAL. And, the decisionmaking panel itself, how many members is that composed of?

Mr. SMITH. Well, it will be four times however many members ratify the convention

Mr. ROSENTHAL. I mean to say the tribunal that is going to hear the dispute.

Mr. SMITH. Well, it can be any uneven number starting with one. For example, it can be three

Mr. ROSENTHAL. And, the parties would have to agree as to the principal panel members?

Mr. SMITH. Yes, but if they can't agree, then the Chairman will select the panel

Mr. LOWENFELD. I want to amplify that a little bit. If they cannot agree, each side picks one.

Mr. ROSENTHAL. Right.

Mr. LOWENFELD. And then they try to agree on a third, and if not, then the Chairman picks the third. I might say I have just been through an arbitration. We don't have too many. This was a government-to-government arbitration, an international air dispute—United States against Italy, and we had a good deal of difficulty in agreeing on panel members. We finally did, but having at your disposal an agreed, acceptable list of persons to choose from makes it very much easier than just trying to get out the directories and going to the libraries and Who's Who and trying to figure out whom can we pick and what has he said, and what has he written and so on.

This is likely to facilitate the resort to arbitration and conciliation procedures.

Mr. ROSENTHAL. I have just one other question. In a practical sense, the legislation itself, not the convention, is the most useful to a U.S. national who has a claim against a foreign country where the foreign country has assets within the United States that would be subject to a district court?

Mr. LOWENFELD. I wouldn't say that. I think maybe that is a possible use.

I think another use is the other way around. I think it may be that foreign government will say, Now, what happens if I win the award? What can I do against General Electric or Jersey Standard and so on, and the answer is, Well, it works both ways. We really don't think that the enforceability of the award will be very complicated.

The anticipation is once you get to an award stage, you have taken it out of politics and you have had an international adjudication and impartial statement by a tribunal that by and large people will pay

Mr. SMITH. If I can add one comment there, of course we are talking about a bill that relates to U.S. law and the implementation of this under our laws. My opinion is that since we are the greatest foreign investor, the number of cases and so on being brought into the courts will be likely to be very limited. This is more applicable probably and and the world in the less developed countries where these

investments are taking place and where the need for arbitration might be greater

Mr. ROSENTHAL. So that the advantage to the American investor situation is he won't have to go and try his case in a foreign court. He will merely sue under judgment of a foreign court.

Mr. SMITH. That is right

Mr. FASCELL. Not only that, but he can reach the assets in a third country

Mr. SMITH. Yes

Mr. ROSENTHAL. Thank you, Mr. Chairman

Mr. FASCELL. Any other questions?

Mr. GROSS. Yes, sir, Mr. Chairman

Mr. FASCELL. Mr. Gross?

Mr. GROSS. What countries constitute the administration of the World Bank, a board or commission or what?

Mr. SMITH. It is a Board of Executive Directors and a Board of Governors. The Board of Governors is composed of one representative of each member country and it meets annually. The Board of Executive Directors——

Mr. GROSS. Is the Governor here this morning?

Mr. SMITH. The U.S. Governor is the U.S. Secretary of Treasury. The U.S. member on the Board of Governors of the World Bank is the Secretary of the Treasury

Mr. GROSS. So, you represent the Governor?

Mr. SMITH. Yes

Mr. GROSS. Is there a Board of Directors?

Mr. SMITH. The Board of Executive Directors——

Mr. GROSS. Who are they?

Mr. SMITH. They are the day-by-day governing body of the World Bank. The United States has a member and many countries are represented

Mr. GROSS. Aren't they interested enough to appear here today or are we going to ignore them, Mr. Chairman?

Mr. FASCELL. We didn't ask them, Mr. Gross, because as far as the legislation is concerned, they have no part in it.

Mr. GROSS. They don't have any part in it, the administrative functionaries for the World Bank?

Mr. FASCELL. Their responsibility, as I see it, is under the treaty or rather, the convention, it has nothing to do with this legislation.

Mr. SMITH. They have issued a report and resolution.

Mr. GROSS. Why did they do that?

You mean in behalf of this bill and legislation?

Mr. SMITH. No, in behalf of the convention. They were in effect the sponsors of this convention, the World Bank

Mr. GROSS. Was this legislation sponsored in the State Department or in Manhattan's Council for Foreign Relations?

Mr. SMITH. It was between Mr. Lowenfeld's office and my office.

Mr. GROSS. It didn't come out of the Council on Foreign Relations or whatever that exclusive club is called.

Mr. SMITH. No, sir

Mr. GROSS. Well, I just wanted to know.

On page 7 you refer to the c-o-m-i-r-e. What is c-o-m-i-t-r-e?

Mr. SMITH. That is diplomatic spelling of c-e-n-t-r-e



Mr Gross  Why don't you people over there use commonly accepted English?  I guess my education has been neglected  I don't understand what c-e-n-t-r-e means used in connection with——

Mr. Lowenfeld  Mr Chairman, when we had one of the regional meetings that developed this convention, I raised that question with the Chairman who was the General Counsel of the World Bank and he pulled out the Oxford Dictionary and said that the preferred spelling under the Oxford Dictionary was that, and I said, that is all right

Mr Gross  Of course, we don't use the Oxford Dictionary around here.  At least I don't.  Maybe some of the rest of them do.

Mr Smith  The original draft of the convention was done by the General Counsel of the World Bank who is a national of the Netherlands, and he probably studied English in a British school

Mr. Gross  Let's continue to genuflect to them in the matter of a centre  I suppose it means the Center; is that right?

Mr. Smith  Yes.  I spelled it the other way in my statement, Mr. Gross.

Mr. Gross.  I am glad you did.

Mr. Fascell.  Gentlemen, thank you very much  There may be material that we may want to obtain from you, and Mr. Czarnecki may have some questions

Thank you very much

(Whereupon, at 11.45 a.m., the subcommittee proceeded with further business.)

## APPENDIXES

### APPENDIX 1

CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

(Submitted to Governments by the Executive Directors of the INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT)

PREAMBLE

*The Contracting States*

*Considering* the need for international cooperation for economic development, and the role of private international investment therein,

*Bearing* in mind the possibility that from time to time disputes may arise in connection with such investment between Contracting States and nationals of other Contracting States,

*Recognizing* that while such disputes would usually be subject to national legal processes, international methods of settlement may be appropriate in certain cases,

*Attaching* particular importance to the availability of facilities for international conciliation or arbitration to which Contracting States and nationals of other Contracting States may submit such disputes if they so desire,

*Desiring* to establish such facilities under the auspices of the International Bank for Reconstruction and Development,

*Recognizing* that mutual consent by the parties to submit such disputes to conciliation or to arbitration through such facilities constitutes a binding agreement which requires in particular that due consideration be given to any recommendation of conciliators, and that any arbitral award be complied with; and

*Declaring* that no Contracting State shall by the mere fact of its ratification, acceptance or approval of this Convention and without its consent be deemed to be under any obligation to submit any particular dispute to conciliation or arbitration,

*Have agreed* as follows:

CHAPTER I. INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

SECTION 1  ESTABLISHMENT AND ORGANIZATION

*Article 1*

(1) There is hereby established the International Centre for Settlement of Investment Disputes (hereinafter called the Centre).

(2) The purpose of the Centre shall be to provide facilities for conciliation and arbitration of investment disputes between Contracting States and nationals of other Contracting States in accordance with the provisions of this Convention.

*Article 2*

The seat of the Centre shall be at the principal office of the International Bank for Reconstruction and Development (hereinafter called the Bank)  The seat may be moved to another place by decision of the Administrative Council adopted by a majority of two-thirds of its members.

*Article 3*

The Centre shall have an Administrative Council and a Secretariat and shall maintain a Panel of Conciliators and a Panel of Arbitrators.

SECTION 2. THE ADMINISTRATIVE COUNCIL

*Article 4*

(1) The Administrative Council shall be composed of one representative of each Contracting State  An alternate may act as representative in case of his principal's absence from a meeting or inability to act.

(2) In the absence of a contrary designation, each governor and alternate governor of the Bank appointed by a Contracting State shall be ex officio its representative and its alternate respectively.

### Article 5

The President of the Bank shall be ex officio Chairman of the Administrative Council (hereinafter called the Chairman) but shall have no vote. During his absence or inability to act and during any vacancy in the office of President of the Bank, the person for the time being acting as President shall act as Chairman of the Administrative Council.

### Article 6

(1) Without prejudice to the powers and functions vested in it by other provisions of this Convention, the Administrative Council shall:

(a) adopt the administrative and financial regulations of the Centre;

(b) adopt the rules of procedure for the institution of conciliation and arbitration proceedings;

(c) adopt the rules of procedure for conciliation and arbitration proceedings (hereinafter called the Conciliation Rules and the Arbitration Rules);

(d) approve arrangements with the Bank for the use of the Bank's administrative facilities and services;

(e) determine the conditions of service of the Secretary-General and of any Deputy Secretary-General;

(f) adopt the annual budget of revenues and expenditures of the Centre;

(g) approve the annual report on the operation of the Centre.

The decisions referred to in sub-paragraphs (a), (b), (c) and (f) above shall be adopted by a majority of two-thirds of the members of the Administrative Council.

(2) The Administrative Council may appoint such committees as it considers necessary.

(3) The Administrative Council shall also exercise such other powers and perform such other functions as it shall determine to be necessary for the implementation of the provisions of this Convention.

### Article 7

(1) The Administrative Council shall hold an annual meeting and such other meetings as may be determined by the Council or convened by the Chairman or convened by the Secretary-General at the request of not less than five members of the Council.

(2) Each member of the Administrative Council shall have one vote and, except as otherwise herein provided, all matters before the Council shall be decided by a majority of the votes cast.

(3) A quorum for any meeting of the Administrative Council shall be a majority of its members.

(4) The Administrative Council may establish, by a majority of two-thirds of its members, a procedure whereby the Chairman may seek a vote of the Council without convening a meeting of the Council. The vote shall be considered valid only if the majority of the members of the Council cast their votes within the time limit fixed by the said procedure.

### Article 8

Members of the Administrative Council and the Chairman shall serve without remuneration from the Centre.

## SECTION 3. THE SECRETARIAT

### Article 9

The Secretariat shall consist of a Secretary-General, one or more Deputy Secretaries-General and staff.

### Article 10

(1) The Secretary-General and any Deputy Secretary-General shall be elected by the Administrative Council by a majority of two-thirds of its members upon the nomination of the Chairman for a term of service not exceeding six years and shall be eligible for re-election. After consulting the members of the Administrative Council, the Chairman shall propose one or more candidates for each such office.

(2) The offices of Secretary-General and Deputy Secretary-General shall be incompatible with the exercise of any political function. Neither the Secretary-General nor any Deputy Secretary-General may hold any other employment or

---

engage in any other occupation except with the approval of the Administrative Council.

(3) During the Secretary-General's absence or inability to act and during any vacancy of the office of Secretary-General, the Deputy Secretary-General shall act as Secretary-General. If there shall be more than one Deputy Secretary-General, the Administrative Council shall determine in advance the order in which they shall act as Secretary-General.

### Article 11

The Secretary-General shall be the legal representative and the principal officer of the Centre and shall be responsible for its administration, including the appointment of staff, in accordance with the provisions of this Convention and the rules adopted by the Administrative Council. He shall perform the function of registrar and shall have the power to authenticate arbitral awards rendered pursuant to this Convention and to certify copies thereof.

## SECTION 4. THE PANELS

### Article 12

The Panel of Conciliators and the Panel of Arbitrators shall each consist of qualified persons, designated as hereinafter provided, who are willing to serve thereon.

### Article 13

(1) Each Contracting State may designate to each Panel four persons who may but need not be its nationals.

(2) The Chairman may designate ten persons to each Panel. The persons so designated to a Panel shall each have a different nationality.

### Article 14

(1) Persons designated to serve on the Panels shall be persons of high moral character and recognized competence in the fields of law, commerce, industry or finance who may be relied upon to exercise independent judgment. Competence in the field of law shall be of particular importance in the case of persons on the Panel of Arbitrators.

(2) The Chairman, in designating persons to serve on the Panels, shall in addition pay due regard to the importance of assuring representation on the Panels of the principal legal systems of the world and of the main forms of economic activity.

### Article 15

(1) Panel members shall serve for renewable periods of six years.

(2) In case of death or resignation of a member of a Panel, the authority which designated the member shall have the right to designate another person to serve for the remainder of that member's term.

(3) Panel members shall continue in office until their successors have been designated.

### Article 16

(1) A person may serve on both Panels.

(2) If a person shall have been designated to serve on the same Panel by more than one Contracting State, or by one or more Contracting States and the Chairman, he shall be deemed to have been designated by the authority which first designated him or, if one such authority is the State of which he is a national, by that State.

(3) All designations shall be notified to the Secretary-General and shall take effect from the date on which the notification is received.

## SECTION 5. FINANCING THE CENTRE

### Article 17

If the expenditure of the Centre cannot be met out of charges for the use of its facilities, or out of other receipts, the excess shall be borne by Contracting States which are members of the Bank in proportion to their respective subscriptions to the capital stock of the Bank, and by Contracting States which are not members of the Bank in accordance with rules adopted by the Administrative Council.

SECTION 6. STATUS, IMMUNITIES AND PRIVILEGES

*Article 18*

The Centre shall have full international legal personality. The legal capacity of the Centre shall include the capacity

- (a) to contract;
- (b) to acquire and dispose of movable and immovable property;
- (c) to institute legal proceedings.

*Article 19*

To enable the Centre to fulfill its functions, it shall enjoy in the territories of each Contracting State the immunities and privileges set forth in this Section.

*Article 20*

The Centre, its property and assets shall enjoy immunity from all legal process, except when the Centre waives this immunity.

*Article 21*

The Chairman, the members of the Administrative Council, persons acting as conciliators or arbitrators or members of a Committee appointed pursuant to paragraph (3) of Article 52 and the officers and employees of the Secretariat

(a) shall enjoy immunity from legal process with respect to acts performed by them in the exercise of their functions, except when the Centre waives this immunity;

(b) not being local nationals, shall enjoy the same immunities from immigration restrictions, alien registration requirements and national service obligations, the same facilities as regards exchange restrictions and the same treatment in respect of travelling facilities as are accorded by Contracting State to the representatives, officials and employees of comparable rank of other Contracting States.

*Article 22*

The provisions of Article 21 shall apply to persons appearing in proceedings under this Convention as parties, agents, counsel, advocates, witnesses or experts; provided, however, that sub-paragraph (b) thereof shall apply only in connection with their travel to and from, and their stay at, the place where the proceedings are held.

*Article 23*

(1) The archives of the Centre shall be inviolable, wherever they may be.

(2) With regard to its official communications, the Centre shall be accorded by each Contracting State treatment not less favourable than that accorded to other international organizations.

*Article 24*

(1) The Centre, its assets, property and income, and its operations and transactions authorized by this Convention shall be exempt from all taxation and customs duties. The Centre shall also be exempt from liability for the collection or payment of any taxes or customs duties.

(2) Except in the case of local nationals, no tax shall be levied on or in respect of expense allowances paid by the Centre to the Chairman or members of the Administrative Council, or on or in respect of salaries, expense allowances or other emoluments paid by the Centre to officials or employees of the Secretariat.

(3) No tax shall be levied on or in respect of fees or expense allowances received by persons acting as conciliators, or arbitrators, or members of a Committee appointed pursuant to paragraph (3) of Article 52 in proceedings under this Convention, if the sole jurisdictional basis for such tax is the location of the Centre or the place where such proceedings are conducted or the place where such fees or allowances are paid.

CHAPTER II. JURISDICTION OF THE CENTRE

*Article 25*

(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.

(2) "National of another Contracting State" means

(a) any natural person who had the nationality of a Contracting State ... other than the State party to the dispute ... at the date ...

consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and

(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention.

(3) Consent by a constituent subdivision or agency of a Contracting State shall require the approval of that State unless that State notifies the Centre that no such approval is required.

(4) Any Contracting State may, at the time of ratification, acceptance or approval of this Convention or at any time thereafter, notify the Centre of the class or classes of disputes which it would or would not consider submitting to the jurisdiction of the Centre. The Secretary-General shall forthwith transmit such notification to all Contracting States. Such notification shall not constitute the consent required by paragraph (1).

*Article 26*

Consent of the parties to arbitration under this Convention shall, unless otherwise stated, be deemed consent to such arbitration to the exclusion of any other remedy. A Contracting State may require the exhaustion of local administrative or judicial remedies as a condition of its consent to arbitration under this Convention.

*Article 27*

(1) No Contracting State shall give diplomatic protection, or bring an international claim, in respect of a dispute which one of its nationals and another Contracting State shall have consented to submit or shall have submitted to arbitration under this Convention, unless such other Contracting State shall have failed to abide by and comply with the award rendered in such dispute.

(2) Diplomatic protection, for the purposes of paragraph (1), shall not include informal diplomatic exchanges for the sole purpose of facilitating a settlement of the dispute.

CHAPTER III. CONCILIATION

SECTION 1. REQUEST FOR CONCILIATION

*Article 28*

(1) Any Contracting State or any national of a Contracting State wishing to institute conciliation proceedings shall address a request to that effect in writing to the Secretary-General who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to conciliation in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

SECTION 2. CONSTITUTION OF THE CONCILIATION COMMISSION

*Article 29*

(1) The Conciliation Commission (hereinafter called the Commission) shall be constituted as soon as possible after registration of a request pursuant to Article 28.

(2) (a) The Commission shall consist of a sole conciliator or any uneven number of conciliators appointed as the parties shall agree.

(b) Where the parties do not agree upon the number of conciliators and the method of their appointment, the Commission shall consist of three conciliators, one conciliator appointed by each party and the third, who shall be the president of the Commission, appointed by agreement of the parties.

*Article 30*

If the Commission shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General ...

continue with paragraph (1) of Article 29, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the conciliator or conciliators not yet appointed.

### Article 31

(1) Conciliators may be appointed from outside the Panel of Conciliators except in the case of appointments by the Chairman pursuant to Article 30.

(2) Conciliators appointed from outside the Panel of Conciliators shall possess the qualities stated in paragraph (1) of Article 14.

### SECTION 3. CONCILIATION PROCEEDINGS

### Article 32

(1) The Commission shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Commission, shall be considered by the Commission which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

### Article 33

Any conciliation proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Conciliation Rules in effect on the date on which the parties consented to conciliation. If any question of procedure arises which is not covered by this Section or the Conciliation Rules or any rules agreed by the parties, the Commission shall decide the question.

### Article 34

(1) It shall be the duty of the Commission to clarify the issues in dispute between the parties and to endeavour to bring about agreement between them upon mutually acceptable terms. To that end, the Commission may at any stage of the proceedings and from time to time recommend terms of settlement to the parties. The parties shall cooperate in good faith with the Commission in order to enable the Commission to carry out its functions, and shall give their most serious consideration to its recommendations.

(2) If the parties reach agreement, the Commission shall draw up a report noting the issues in dispute and recording that the parties have reached agreement. If, at any stage of the proceedings, it appears to the Commission that there is no likelihood of agreement between the parties, it shall close the proceedings and shall draw up a report noting the submission of the dispute and recording the failure of the parties to reach agreement. If one party fails to appear or participate in the proceedings the Commission shall close the proceedings and shall draw up a report noting that party's failure to appear or participate.

### Article 35

Except as the parties to the dispute shall otherwise agree, neither party to a conciliation proceeding shall be entitled in any other proceeding, whether before arbitrators or in a court of law or otherwise, to invoke or rely on any views expressed or statements or admissions or offers of settlement made by the other party in the conciliation proceedings, or the report or any recommendations made by the Commission.

## CHAPTER IV. ARBITRATION

### SECTION 1. REQUEST FOR ARBITRATION

### Article 36

(1) Any Contracting State or any national of a Contracting State wishing to institute arbitration proceedings shall address a request to that effect in writing to the Secretary-General, who shall send a copy of the request to the other party.

(2) The request shall contain information concerning the issues in dispute, the identity of the parties and their consent to arbitration in accordance with the rules of procedure for the institution of conciliation and arbitration proceedings.

(3) The Secretary-General shall register the request unless he finds, on the basis of the information contained in the request, that the dispute is manifestly outside the jurisdiction of the Centre. He shall forthwith notify the parties of registration or refusal to register.

### SECTION 2. CONSTITUTION OF THE TRIBUNAL

### Article 37

(1) The Arbitral Tribunal (hereinafter called the Tribunal) shall be constituted as soon as possible after registration of a request pursuant to Article 36.

(2)(a) The Tribunal shall consist of a sole arbitrator or any uneven number of arbitrators appointed as the parties shall agree.

(b) Where the parties do not agree upon the number of arbitrators and the method of their appointment, the Tribunal shall consist of three arbitrators, one arbitrator appointed by each party and the third, who shall be the president of the Tribunal, appointed by agreement of the parties.

### Article 38

If the Tribunal shall not have been constituted within 90 days after notice of registration of the request has been dispatched by the Secretary-General in accordance with paragraph (3) of Article 36, or such other period as the parties may agree, the Chairman shall, at the request of either party and after consulting both parties as far as possible, appoint the arbitrator or arbitrators not yet appointed. Arbitrators appointed by the Chairman pursuant to this Article shall not be nationals of the Contracting State party to the dispute or of the Contracting State whose national is a party to the dispute.

### Article 39

The majority of the arbitrators shall be nationals of States other than the Contracting State party to the dispute and the Contracting State whose national is a party to the dispute, provided, however, that the foregoing provisions of this Article shall not apply if the sole arbitrator or each individual member of the Tribunal has been appointed by agreement of the parties.

### Article 40

(1) Arbitrators may be appointed from outside the Panel of Arbitrators, except in the case of appointments by the Chairman pursuant to Article 38.

(2) Arbitrators appointed from outside the Panel of Arbitrators shall possess the qualities stated in paragraph (1) of Article 14.

### SECTION 3. POWERS AND FUNCTIONS OF THE TRIBUNAL

### Article 41

(1) The Tribunal shall be the judge of its own competence.

(2) Any objection by a party to the dispute that that dispute is not within the jurisdiction of the Centre, or for other reasons is not within the competence of the Tribunal, shall be considered by the Tribunal which shall determine whether to deal with it as a preliminary question or to join it to the merits of the dispute.

### Article 42

(1) The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

(2) The Tribunal may not bring in a finding of non liquet on the ground of silence or obscurity of the law.

(3) The provisions of paragraphs (1) and (2) shall not prejudice the power of the Tribunal to decide a dispute ex aequo et bono if the parties so agree.

### Article 43

Except as the parties otherwise agree, the Tribunal may if it deems it necessary at any stage of the proceedings,

(a) call upon the parties to produce documents or other evidence; and

(b) visit the scene connected with the dispute, and conduct such inquiries there as it may deem appropriate.

### Article 44

Any arbitration proceeding shall be conducted in accordance with the provisions of this Section and, except as the parties otherwise agree, in accordance with the Arbitration Rules in effect on the date on which the parties consented to arbitration. If any question of procedure arises which is not covered by this Section or the Arbitration Rules or any rules agreed by the parties, the Tribunal shall decide the question.

*Article 46*

(1) Failure of a party to appear or to present his case shall not be deemed an admission of the other party's assertions.

(2) If a party fails to appear or to present his case at any stage of the proceedings the other party may request the Tribunal to deal with the questions submitted to it and to render an award. Before rendering an award, the Tribunal shall notify, and grant a period of grace to, the party failing to appear or to present its case, unless it is satisfied that that party does not intend to do so.

*Article 48*

Except as the parties otherwise agree, the Tribunal shall, if requested by a party, determine any incidental or additional claims or counter-claims arising directly out of the subject-matter of the dispute provided that they are within the scope of the consent of the parties and are otherwise within the jurisdiction of the Centre.

*Article 47*

Except as the parties otherwise agree, the Tribunal may, if it considers that the circumstances so require, recommend any provisional measures which should be taken to preserve the respective rights of either party.

SECTION 4. THE AWARD

*Article 48*

(1) The Tribunal shall decide questions by a majority of the votes of all its members.

(2) The award of the Tribunal shall be in writing and shall be signed by the members of the Tribunal who voted for it.

(3) The award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based.

(4) Any member of the Tribunal may attach his individual opinion to the award, whether he dissents from the majority or not, or a statement of his dissent.

(5) The Centre shall not publish the award without the consent of the parties.

*Article 49*

(1) The Secretary-General shall promptly dispatch certified copies of the award to the parties. The award shall be deemed to have been rendered on the date on which the certified copies were dispatched.

(2) The Tribunal upon the request of a party made within 45 days after the date on which the award was rendered may after notice to the other party decide any question which it had omitted to decide in the award, and shall rectify any clerical, arithmetical or similar error in the award. Its decision shall become part of the award and shall be notified to the parties in the same manner as the award. The periods of time provided for under paragraph (2) of Article 51 and paragraph (2) of Article 52 shall run from the date on which the decision was rendered.

SECTION 5. INTERPRETATION, REVISION AND ANNULMENT OF THE AWARD

*Article 50*

(1) If any dispute shall arise between the parties as to the meaning or scope of an award, either party may request interpretation of the award by an application in writing addressed to the Secretary-General.

(2) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter. The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision.

*Article 51*

(1) Either party may request revision of the award by an application in writing addressed to the Secretary-General on the ground of ... such a nature as decisively to affect the award provided that it was rendered that fact was unknown to the Tribunal and to the applicant's ignorance of that fact was not due to ...

(3) The application shall be made within 90 days ... fact and in any event within three years after the date on which the award was rendered

---

(3) The request shall, if possible, be submitted to the Tribunal which rendered the award. If this shall not be possible, a new Tribunal shall be constituted in accordance with Section 2 of this Chapter.

(4) The Tribunal may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Tribunal rules on such request.

*Article 52*

(1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:

(a) that the Tribunal was not properly constituted;

(b) that the Tribunal has manifestly exceeded its powers;

(c) that there was corruption on the part of a member of the Tribunal;

(d) that there has been a serious departure from a fundamental rule of procedure; or

(e) that the award has failed to state the reasons on which it is based.

(2) The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered.

(3) On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an ad hoc Committee of three persons. None of the members of the Committee shall have been a member of the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute. The Committee shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1).

(4) The provisions of Articles 41-45, 48, 49, 53 and 54, and of Chapters VI and VII shall apply mutatis mutandis to proceedings before the Committee.

(5) The Committee may, if it considers that the circumstances so require, stay enforcement of the award pending its decision. If the applicant requests a stay of enforcement of the award in his application, enforcement shall be stayed provisionally until the Committee rules on such request.

(6) If the award is annulled the dispute shall, at the request of either party, be submitted to a new Tribunal constituted in accordance with Section 2 of this Chapter.

SECTION 6. RECOGNITION AND ENFORCEMENT OF THE AWARD

*Article 53*

(1) The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2) For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

*Article 54*

(1) Each Contracting State shall recognise an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2) A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3) Execution of the award shall be governed by the laws ... the ...



*Article 55*

Nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

## CHAPTER V. REPLACEMENT AND DISQUALIFICATION OF CONCILIATORS AND ARBITRATORS

*Article 56*

(1) After a Commission or a Tribunal has been constituted and proceedings have begun, its composition shall remain unchanged, provided, however that if a conciliator or an arbitrator should die, become incapacitated, or resign, the resulting vacancy shall be filled in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

(2) A member of a Commission or Tribunal shall continue to serve in that capacity notwithstanding that he shall have ceased to be a member of the Panel.

(3) If a conciliator or arbitrator appointed by a party shall have resigned without the consent of the Commission or Tribunal of which he was a member, the Chairman shall appoint a person from the appropriate Panel to fill the resulting vacancy.

*Article 57*

A party may propose to a Commission or Tribunal the disqualification of any of its members on account of any fact indicating a manifest lack of the qualities required by paragraph (1) of Article 14. A party to arbitration proceedings may, in addition, propose the disqualification of an arbitrator on the ground that he was ineligible for appointment to the Tribunal under Section 2 of Chapter IV.

*Article 58*

The decision on any proposal to disqualify a conciliator or arbitrator shall be taken by the other members of the Commission or Tribunal as the case may be, provided that where those members are equally divided, or in the case of a proposal to disqualify a sole conciliator or arbitrator, or a majority of the conciliators or arbitrators, the Chairman shall take that decision. If it is decided that the proposal is well-founded the conciliator or arbitrator to whom the decision relates shall be replaced in accordance with the provisions of Section 2 of Chapter III or Section 2 of Chapter IV.

## CHAPTER VI. COST OF PROCEEDINGS

*Article 59*

The charges payable by the parties for the use of the facilities of the Centre shall be determined by the Secretary-General in accordance with the regulations adopted by the Administrative Council.

*Article 60*

(1) Each Commission and each Tribunal shall determine the fees and expenses of its members within limits established from time to time by the Administrative Council and after consultation with the Secretary-General.

(2) Nothing in paragraph (1) of this Article shall preclude the parties from agreeing in advance with the Commission or Tribunal concerned upon the fees and expenses of its members.

*Article 61*

(1) In the case of conciliation proceedings the fees and expenses of members of the Commission as well as the charges for the use of the facilities of the Centre, shall be borne equally by the parties. Each party shall bear any other expenses it incurs in connection with the proceedings.

(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.

## CHAPTER VII. PLACE OF PROCEEDINGS

*Article 62*

Conciliation and arbitration proceedings shall be held at the seat of the Centre except as hereinafter provided.

*Article 63*

Conciliation and arbitration proceedings may be held, if the parties so agree,

(a) at the seat of the Permanent Court of Arbitration or of any other appropriate institution, whether private or public, with which the Centre may make arrangements for that purpose; or

(b) at any other place approved by the Commission or Tribunal after consultation with the Secretary-General.

## CHAPTER VIII. DISPUTES BETWEEN CONTRACTING STATES

*Article 64*

Any dispute arising between Contracting States concerning the interpretation or application of this Convention which is not settled by negotiation shall be referred to the International Court of Justice by the application of any party to such dispute, unless the States concerned agree to another method of settlement.

## CHAPTER IX. AMENDMENT

*Article 65*

Any Contracting State may propose amendment of this Convention. The text of a proposed amendment shall be communicated to the Secretary-General not less than 90 days prior to the meeting of the Administrative Council at which such amendment is to be considered and shall forthwith be transmitted by him to all the members of the Administrative Council

*Article 66*

(1) If the Administrative Council shall so decide by a majority of two-thirds of its members, the proposed amendment shall be circulated to all Contracting States for ratification, acceptance or approval. Each amendment shall enter into force 30 days after dispatch by the depositary of this Convention of a notification to Contracting States that all Contracting States have ratified, accepted or approved the amendment.

(2) No amendment shall affect the rights and obligations under this Convention of any Contracting State or of any of its constituent subdivisions or agencies, or of any national of such State arising out of consent to the jurisdiction of the Centre given before the date of entry into force of the amendment.

## CHAPTER X. FINAL PROVISIONS

*Article 67*

This Convention shall be open for signature on behalf of States members of the Bank. It shall also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign the Convention.

*Article 68*

(1) This Convention shall be subject to ratification, acceptance or approval by the signatory States in accordance with their respective constitutional procedures.

(2) This Convention shall enter into force 30 days after the date of deposit of the twentieth instrument of ratification, acceptance or approval. It shall enter into force for each State which subsequently deposits its instrument of ratification, acceptance or approval 30 days after the date of such deposit.

*Article 69*

Each Contracting State shall take such legislative or other measures as may be necessary for making the provisions of this Convention effective in its territories.

*Article 70*

This Convention shall apply to all territories for whose international relations a Contracting State is responsible, except those which are excluded by such State by written notice to the depositary of this Convention either at the time of ratification, acceptance or approval or subsequently

*Article 71*

Any Contracting State may denounce this Convention by written notice to the depositary of this Convention. The denunciation shall take effect six months after receipt of such notice.

*Article 72*

No... ...Contracting State pursuant to Articles 70 or 71 shall...



34  CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES

subdivisions or agencies or of any national of that State arising out of consent to the jurisdiction of the Centre given by one of them before such notice was received by the depositary

Article 73

Instruments of ratification, acceptance or approval of this Convention and of amendments thereto shall be deposited with the Bank which shall act as the depositary of this Convention.  The depositary shall transmit certified copies of this Convention to States members of the Bank and to any other State invited to sign the Convention.

Article 74

The depositary shall register this Convention with the Secretariat of the United Nations in accordance with Article 102 of the Charter of the United Nations and the Regulations thereunder adopted by the General Assembly.

Article 75

The depositary shall notify all signatory States of the following:
   (a) signatures in accordance with Article 67;
   (b) deposits of instruments of ratification, acceptance and approval in accordance with Article 73;
   (c) the date on which this Convention enters into force in accordance with Article 68;
   (d) exclusions from territorial application pursuant to Article 70;
   (e) the date on which any amendment of this Convention enters into force in accordance with Article 66; and
   (f) denunciations in accordance with Article 71

Done at Washington in the English, French and Spanish languages, all three texts being equally authentic, in a single copy which shall remain deposited in the archives of the International Bank for Reconstruction and Development, which has indicated by its signature below its agreement to fulfill the functions with which it is charged under this Convention.

For the International Bank for Reconstruction and Development:
   GEORGE D. WOODS, *President*.
   A. BROCHES, *General Counsel*.
   March 18, 1965.
For Tunisia:
   RACHID DRISS.
   May 5, 1965.
For United Kingdom.
   PATRICK DEAN.
   May 30, 1965.
For Jamaica.
   NEVILLE ASHENHEIM.
   June 23, 1965.
For the Republic of Ivory Coast [translation]:
   D. ACOUSSI.
   June 30, 1965.
For Pakistan
   G. AHMED
   July 6, 1965.
For Nigeria:
   S. O. ADEBO.
   July 13, 1965.
For the Islamic Republic of Mauritania [translation]:
   AHMED BABA OULD AHMED MISKE.
   July 30, 1965.
For the Republic of Niger [translation]:
   ILLA SALIFOU
   Août 23, 1965.
For the Central African Republic [translation]:
   MICHEL GALLIN-DOUATHE.
   Août 26, 1965.
For United States:
   HENRY H. FOWLER.
   August 27, 1965

## APPENDIX II

### RESOLUTION 65-14—SETTLEMENT OF INVESTMENT DISPUTES

#### INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT,
*Washington D C*

Whereas the Board of Governors on September 10, 1964, adopted Resolution 214 providing as follows:
*Resolved*
   (a) The report of the Executive Directors on "Settlement of Investment Disputes," dated August 6, 1964, is hereby approved
   (b) The Executive Directors are requested to formulate a convention establishing facilities and procedures which would be available on a voluntary basis for the settlement of investment disputes between contracting states and nationals of other contracting states through conciliation and arbitration.
   (c) In formulating such a convention, the Executive Directors shall take into account the views of member governments and shall keep in mind the desirability of arriving at a text which could be accepted by the largest possible number of governments.
   (d) The Executive Directors shall submit the text of such a convention to member governments with such recommendations as they shall deem appropriate.

Now, therefore the Executive Directors hereby resolve as follows:
   (1) The text of the Convention on the Settlement of Investment Disputes Between States and Nationals of Other States formulated by the Executive Directors in the form presented to this meeting and the report of the Executive Directors thereon are hereby approved for submission to member governments of the Bank;
   (2) The President of the Bank shall transmit said report and the text of the said convention to all member governments of the Bank;
   (3) The President and the General Counsel of the Bank shall sign a copy of said convention on behalf of the Bank to indicate the Bank's agreement to fulfill the functions with which it is charged under the convention;
   (4) The copy of the convention so signed on behalf of the Bank shall remain deposited in the archives of the Bank and shall be open for signature on behalf of governments in accordance with its terms.
   (Adopted by the Executive Directors Mar. 18, 1965.  Dr. Mejia-Palacio wished to be recorded as voting against the resolution )

35

APPENDIX III

REPORT OF THE EXECUTIVE DIRECTORS ON THE CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES BETWEEN STATES AND NATIONALS OF OTHER STATES

INTERNATIONAL BANK FOR RECONSTRUCTION AND DEVELOPMENT

I

1. Resolution No. 214 adopted by the Board of Governors of the International Bank for Reconstruction and Development on September 10, 1964, provides as follows:

"Resolved:

(a) The report of the Executive Directors on 'Settlement of Investment Disputes,' dated August 6, 1964, is hereby approved.

(b) The Executive Directors are requested to formulate a convention establishing facilities and procedures which would be available on a voluntary basis for the settlement of investment disputes between contracting States and Nationals of other contracting States through conciliation and arbitration.

(c) In formulating such a convention, the Executive Directors shall take into account the views of member governments and shall keep in mind the desirability of arriving at a text which could be accepted by the largest possible number of governments.

(d) The Executive Directors shall submit the text of such a convention to member governments with such recommendations as they shall deem appropriate."

2. The Executive Directors of the Bank, acting pursuant to the foregoing Resolution, have formulated a Convention on the Settlement of Investment Disputes between States and Nationals of other States and, on March 18, 1965, approved the submission of the text of the Convention, as attached hereto, to member governments of the Bank. This action by the Executive Directors does not, of course, imply that the governments represented by the individual Executive Directors are committed to take action on the Convention.

3. The action by the Executive Directors was preceded by extensive preparatory work details of which are given in paragraphs 6-8 below. The Executive Directors are satisfied that the Convention in the form attached hereto represents a broad consensus of the views of those governments which accept the principle of establishing by intergovernmental agreement facilities and procedures for the settlement of investment disputes which States and foreign investors wish to submit to conciliation or arbitration. They are also satisfied that the Convention constitutes a suitable framework for such facilities and procedures. Accordingly, the text of the Convention is submitted to member governments for consideration with a view to signature and ratification, acceptance or approval.

4. The Executive Directors invite attention to the provisions of Article 68(2) pursuant to which the Convention will enter into force as between the Contracting States 30 days after deposit with the Bank, the depositary of the Convention, of the twentieth instrument of ratification, acceptance or approval.

5. The attached text of the Convention in the English, French and Spanish languages has been deposited in the archives of the Bank, as depositary, and is open for signature.

II

6. The question of the desirability and practicability of establishing institutional facilities, sponsored by the Bank, for the settlement and arbitration of investment disputes between States first placed before the Board of Governors of the Bank Meeting, held in Washington, D.C. in September, Board of Governors, by Resolution No. 174, adopt requested the Executive Directors to study the qu...

7. After a series of informal discussions on the basis pursued by the staff of the Bank, the Executive Directors should begin a consultation therewith ... and expe...

through conciliation and foreign investors was through an Annual that Meeting the ptember 18, 1962.

...rking papers pre...
...ted that the Bank at which ... ...r

## CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES 37

governments to consider the subject in greater detail. The consultative meetings were held on a regional basis in Addis Ababa (December 16–20, 1963), Santiago de Chile (February 3–7, 1964), Geneva (February 17–21, 1964) and Bangkok (April 27–May 1, 1964), with the administrative assistance of the United Nations Economic Commissions and the European Office of the United Nations, and took as the basis for discussion a Preliminary Draft of a Convention on Settlement of Investment Disputes between States and Nationals of Other States prepared by the staff of the Bank in the light of the discussions of the Executive Directors and the views of governments. The meetings were attended by legal experts from 86 countries.

8. In the light of the preparatory work and of the views expressed at the consultative meetings, the Executive Directors reported to the Board of Governors at its Nineteenth Annual Meeting in Tokyo, in September 1964, that it would be desirable to establish the institutional facilities envisaged, and to do so within the framework of an intergovernmental agreement. The Board of Governors adopted the Resolution set forth in paragraph 1 of this Report, whereupon the Executive Directors undertook the formulation of the present Convention. With a view to arriving at a text which could be accepted by the largest possible number of governments, the Bank invited its members in inadequate representatives to a Legal Committee which would assist the Executive Directors in their task. This Committee met in Washington from November 23 through December 11, 1964, and the Executive Directors gratefully acknowledge the valuable advice they received from the representatives of the 61 member countries who served on the Committee.

9. In submitting the attached Convention to governments, the Executive Directors are prompted by the desire to strengthen the partnership between countries in the cause of economic development. The creation of an institution designed to facilitate the settlement of disputes between States and foreign investors can be a major step toward promoting an atmosphere of mutual confidence and thus stimulating a larger flow of private international capital into those countries which wish to attract it.

10. The Executive Directors recognize that investment disputes are as a rule settled through administrative, judicial or arbitral procedures available under the laws of the country in which the investment concerned is made. However, experience shows that disputes may arise which the parties wish to settle by other methods; and in instances agreements entered into in recent years show that both States and investors frequently consider that it is in their mutual interest to agree to resort to international methods of settlement.

11. The present Convention would offer international methods of settlement designed to take account of the special characteristics of the disputes covered, as well as of the parties to whom it would apply. It would provide facilities for conciliation and arbitration by specially qualified persons of independent judgment carried out according to rules known and accepted in advance by the parties concerned. In particular, it would ensure that once a government or investor had given consent to conciliation or arbitration under the auspices of the Centre, such consent could not be unilaterally withdrawn.

12. The Executive Directors believe that private capital will continue to flow to countries offering a favorable climate for attractive and sound investments, even if such countries did not become parties to the Convention or, having joined, did not make use of the facilities of the Centre. On the other hand, adherence to the Convention by a country would provide additional inducement and stimulate a larger flow of private international investment into its territories, which is the primary purpose of the Convention.

13. While the broad objective of the Convention is to encourage a larger flow of private international investment, the provisions of the Convention maintain a careful balance between the interests of investors and those of host States. Moreover, the Convention permits the institution of proceedings by host States as well as by investors and the Executive Directors have constantly had in mind that the provisions of the Convention should be equally adapted to the requirements of both cases.

14. The provisions of the attached Convention are for the most part self-explanatory. Brief comment on a few principal features may, however, be useful to member governments in their consideration of the Convention.

### IV. THE INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

*General*

15. The Convention establishes the International Centre for Settlement of Investment Disputes as an autonomous international institution (Articles 18-24). The purpose of the Centre is "to provide facilities for conciliation and arbitration of investment disputes * * *" (Article 1(2)). The Centre will not itself engage in conciliation or arbitration activities. This will be the task of Conciliation Commissions and Arbitral Tribunals constituted in accordance with the provisions of the Convention.

16. As sponsor of the establishment of the institution the Bank will provide the Centre with premises for its seat (Article 2) and, pursuant to arrangements between the two institutions, with other administrative facilities and services (Article 6(d)).

17. With respect to the financing of the Centre (Article 17), the Executive Directors have decided that the Bank should be prepared to provide the Centre with office accommodation free of charge as long as the Centre has its seat at the Bank's headquarters and to underwrite, within reasonable limits, the basic overhead expenditure of the Centre for a period of years to be determined after the Centre is established.

18. Simplicity and economy consistent with the efficient discharge of the functions of the Centre characterize its structure. The organs of the Centre are the Administrative Council (Articles 4-8) and the Secretariat (Articles 9-11). The Administrative Council will be composed of one representative of each Contracting State, serving without remuneration from the Centre. Each member of the Council casts one vote and matters before the Council are decided by a majority of the votes cast unless a different majority is required by the Convention. The President of the Bank will serve *ex officio* as the Council's Chairman but will have no vote. The Secretariat will consist of a Secretary-General, one or more Deputy Secretaries-General and staff. In the interest of flexibility the Convention provides for the possibility of there being more than one Deputy Secretary-General, but the Executive Directors do not foresee a need for more than one or two full time high officials of the Centre. Article 10, which requires that the Secretary-General and any Deputy Secretary-General be elected by the Administrative Council by a majority of two-thirds of its members, on the nomination of the Chairman, limits their terms of office to a period not exceeding six years and permits their re-election. The Executive Directors believe that the initial election, which will take place shortly after the Convention will have come into force, should be for a short term so as not to deprive the States which ratify the Convention after its entry into force of the possibility of participating in the selection of the high officials of the Centre. Article 10 also limits the extent to which these officials may engage in activities other than their official functions.

*Functions of the Administrative Council*

19. The principal functions of the Administrative Council are the election of the Secretary-General and any Deputy Secretary-General, the adoption of the budget of the Centre and the adoption of administrative and financial regulations, rules governing the institution of proceedings and rules of procedure for conciliation and arbitration proceedings. Action on all these matters requires a majority of two-thirds of the members of the Council.

*Functions of the Secretary-General*

20. The Convention requires the Secretary-General to perform a variety of administrative functions and as legal representative, registrar and principal officer of the Centre (Articles 7(1), 11, 16(3), 25(4), 28, 36, 49(1), 50(1), 51(1), 52(1), 54(2), 59, 60(1), 63(b) and 65). In addition, the Secretary-General is given the power to refuse registration of a request for conciliation proceedings or arbitration proceedings, and thereby to prevent the institution of such proceedings, if on the basis of the information furnished by the applicant he finds that the dispute is manifestly outside the jurisdiction of the Centre (Article 28(3) and 36(3)). The Secretary-General is given this limited power to "screen" requests for conciliation or arbitration proceedings with a view to avoiding the embarrassment to a party (particularly a State) which might result from the institution of proceedings against it in a dispute which it had not consented to submit to the Centre, as well as the possibility that the machinery of the Centre would be set in motion in a case which for other reasons obviously outside the jurisdiction of the Centre i.e. because either the applicant or the other party were not eligible to be a party in proceedings...

*The Panels*

21. Article 3 requires the Centre to maintain a Panel of Conciliators and a Panel of Arbitrators, while Articles 12-16 outline the manner and terms of designation of Panel members. In particular, Article 14(1) seeks to ensure that Panel members will possess a high degree of competence and be capable of exercising independent judgment. In keeping with the essentially flexible character of the proceedings, the Convention permits the parties to appoint conciliators and arbitrators from outside the Panels but requires (Articles 31(2) and 40(2)) that such appointees possess the qualities stated in Article 14(1). The Chairman, when called upon to appoint a conciliator or arbitrator pursuant to Article 30 or 38, is restricted in his choice to Panel members.

### V. JURISDICTION OF THE CENTRE

22. The term "jurisdiction of the Centre" is used in the Convention as a convenient expression to mean the limits within which the provisions of the Convention will apply and the facilities of the Centre will be available for conciliation and arbitration proceedings. The jurisdiction of the Centre is dealt with in Chapter II of the Convention (Articles 25-27).

*Consent*

23. Consent of the parties is the cornerstone of the jurisdiction of the Centre. Consent to jurisdiction must be in writing and once given cannot be withdrawn unilaterally (Article 25(1)).

24. Consent of the parties must exist when the Centre is seized (Articles 28(3) and 36(3)) but the Convention does not otherwise specify the time at which consent should be given. Consent may be given, for example, in a clause included in an investment agreement, providing for the submission to the Centre of future disputes arising out of that agreement, or in a compromise regarding a dispute which has already arisen. Nor does the Convention require that the consent of both parties be expressed in a single instrument. Thus, a host State might in its investment promotion legislation offer to submit disputes arising out of certain classes of investments to the jurisdiction of the Centre, and the investor might give his consent by accepting the offer in writing.

25. While consent of the parties is an essential prerequisite for the jurisdiction of the Centre, consent alone will not suffice to bring a dispute within its jurisdiction. In keeping with the purpose of the Convention, the jurisdiction of the Centre is further limited by reference to the nature of the dispute and the parties thereto.

*Nature of the dispute*

26. Article 25(1) requires that the dispute must be a "legal dispute arising directly out of an investment." The expression "legal dispute" has been used to make clear that while conflicts of rights are within the jurisdiction of the Centre, mere conflicts of interests are not. The dispute must concern the existence or scope of a legal right or obligation, or the nature or extent of the reparation to be made for breach of a legal obligation.

27. No attempt was made to define the term "investment" given the essential requirement of consent by the parties, and the mechanism through which Contracting States can make known in advance, if they so desire, the classes of disputes which they would or would not consider submitting to the Centre (Article 25(4)).

*Parties to the dispute*

28. For a dispute to be within the jurisdiction of the Centre one of the parties must be a Contracting State (or a constituent subdivision or agency of a Contracting State) and the other party must be a "national of another Contracting State." The latter term as defined in paragraph (a) of Article 26 covers both natural persons and juridical persons.

29. It should be noted that under clause (a) of Article 25(3) a natural person who was a national of the State party to the dispute would not be eligible to be a party in proceedings under the auspices of the Centre, even if at the same time he had the nationality of another State. This ineligibility is absolute and cannot be cured even if the State party to the dispute had given its consent.

30. Clause (b) of Article 25(3), which deals with juridical persons, is more flexible. A juridical person which had the nationality of the State party to the dispute would be eligible to be a party in proceedings under the auspices of the...

Case 1:21-cv-02464-RBW   Document 9-2   Filed 08/08/22   Page 22 of 23

*Notifications by Contracting States*

31. While on conciliation or arbitration proceedings could be brought against a Contracting State without its consent, and while no Contracting State is under any obligation to give its consent to such proceedings, it may be nevertheless felt that adherence to the Convention might be interpreted as holding out an expectation that Contracting States would give favorable consideration to requests by investors for the submission of a dispute to the Centre. It was pointed out in this connection that there might be classes of investment disputes which governments would consider unsuitable for submission to the Centre or which, under their own law, they were not permitted to submit to the Centre. In order to avoid any risk of misunderstanding on this score, Article 25(4) expressly permits Contracting States to make known to the Centre in advance, if they so desire, the classes of disputes which they would or would not consider submitting to the Centre. The provision makes clear that a statement by a Contracting State that it would consider submitting a certain class of dispute to the Centre would serve for purposes of information only and would not constitute the consent required to give the Centre jurisdiction. Of course, a statement excluding certain classes of disputes from consideration would not constitute a reservation to the Convention.

*Arbitration as exclusive remedy*

32. It may be presumed that when a State and an investor agree to have recourse to arbitration, and do not reserve the right to have recourse to other remedies or require the prior exhaustion of other remedies, the intention of the parties is to have recourse to arbitration to the exclusion of any other remedy. This rule of interpretation is embodied in the first sentence of Article 26. In order to make clear that it was not intended thereby to modify the rules of international law regarding the exhaustion of local remedies, the second sentence explicitly recognizes the right of a State to require the prior exhaustion of local remedies.

*Claims by the investor's State*

33. When a host State consents to the submission of a dispute with an investor to the Centre, thereby giving the investor direct access to an international jurisdiction, the investor should not be in a position to ask his State to espouse his case, and that State should not be permitted to do so. Accordingly, Article 27 expressly prohibits a Contracting State from giving diplomatic protection, or bringing an international claim, in respect of a dispute which one of its nationals and another Contracting State shall have consented to submit, or have submitted, to arbitration under the Convention, unless the State party to the dispute fails to honor the award rendered in that dispute.

## VI. PROCEEDINGS UNDER THE CONVENTION

*Institution of proceedings*

34. Proceedings are instituted by request addressed to the Secretary-General (Articles 28 and 36). After registration of the request the Conciliation Commission or Arbitral Tribunal, as the case may be, will be constituted. Reference is made to paragraph 20 above on the power of the Secretary-General to refuse registration.

*Constitution of Conciliation Commissions and Arbitral Tribunals*

35. Although the Convention leaves the parties a large measure of freedom as regards the constitution of Commissions and Tribunals, it assures that a lack of agreement between the parties on these matters or the unwillingness of a party to cooperate will not frustrate proceedings (Articles 29–30 and 37–38, respectively).

36. Mention has already been made of the fact that the parties are free to appoint conciliators and arbitrators from outside the Panels (see paragraph 21 above). While the Convention does not restrict the appointment of conciliators with reference to nationality, Article 39 lays down the rule that the majority of the members of an Arbitral Tribunal should not be nationals either of the State party to the dispute or of the State whose national is a party to the dispute. This rule is likely to have the effect of excluding persons having these nationalities from serving on a Tribunal composed of not more than three members. However the rule will not apply where each and every arbitrator on the Tribunal has been appointed by agreement of the parties.

*Conciliation proceedings, powers and functions of Arbitral Tribunals*

37. In general, the provisions of Articles 32–35 dealing with conciliation proceedings and of Articles 41–49, dealing with the powers and functions of Arbitral Tribunals and awards rendered by such Tribunals, are self-explanatory. The differences between the two sets of provisions reflect the basic distinction between the process of conciliation which seeks to bring the parties to agreement and that of arbitration which aims at a binding determination of the dispute by the Tribunal.

38. Article 41 reiterates the well-established principle that international tribunals are to be the judges of their own competence and Article 32 applies the same principle to Conciliation Commissions. It is to be noted in this connection that the power of the Secretary-General to refuse registration of a request for conciliation or arbitration (see paragraph 20 above) is so narrowly defined as not to encroach on the prerogative of Commissions and Tribunals to determine their own competence and, on the other hand, that registration of a request by the Secretary-General does not, of course, preclude a Commission or Tribunal from finding that the dispute is outside the jurisdiction of the Centre.

39. In keeping with the consensual character of proceedings under the Convention, the parties to conciliation or arbitration proceedings may agree on the rules of procedure which will apply in those proceedings. However, if or to the extent that they have not so agreed the Conciliation Rules and Arbitration Rules adopted by the Administrative Council will apply (Articles 33 and 44).

40. Under the Convention an Arbitral Tribunal is required to apply the law agreed by the parties. Failing such agreement, the Tribunal must apply the law of the State party to the dispute (unless that law calls for the application of some other law), as well as such rules of international law as may be applicable. The term "international law" as used in this context should be understood in the sense given to it by Article 38(1) of the Statute of the International Court of Justice, allowance being made for the fact that Article 38 was designed to apply to inter-State disputes.[†]

*Recognition and enforcement of arbitral awards*

41. Article 53 declares that the parties are bound by the award and that it shall not be subject to appeal or to any other remedy except those provided for in the Convention. The remedies provided for are revision (Article 51) and annulment (Article 52). In addition, a party may ask a Tribunal which had omitted to decide any question submitted to it, to supplement its award (Article 49(2)) and may request interpretation of the award (Article 50).

42. Subject to any stay of enforcement in connection with any of the above proceedings in accordance with the provisions of the Convention, the parties are obliged to abide by and comply with the award and Article 54 requires every Contracting State to recognize the award as binding and to enforce the pecuniary obligations imposed by the award as if it were a final decision of a domestic court. Because of the different legal techniques followed in common law and civil law jurisdictions and the different judicial systems found in unitary and federal or other non-unitary States, Article 54 does not prescribe any particular method to be followed in its domestic implementation, but requires each Contracting State to meet the requirements of the Article in accordance with its own legal system.

43. The doctrine of sovereign immunity may prevent the forced execution in a State of judgments obtained against foreign States or against the State in which execution is sought. Article 54 requires Contracting States to equate an award rendered pursuant to the Convention with a final judgment of its own courts. It does not require them to go beyond that and to undertake forced execution of awards rendered pursuant to the Convention in cases in which final judgments could not be executed. In order to leave no doubt on this point Article 55 provides that nothing in Article 54 shall be construed as derogating from the law in force in any Contracting State relating to immunity of that State or of any foreign State from execution.

[†] Article 38(1) of the Statute of the International Court of Justice reads as follows:
"1. The Court, whose function it is to decide in accordance with international law such disputes as are submitted to it, shall apply:
(a) international conventions, whether general or particular, establishing rules expressly recognized by the contesting states;
(b) international custom, as evidence of a general practice accepted as law;
(c) the general principles of law recognized by civilized nations;
(d) subject to the provisions of Article 59, judicial decisions and the teachings of the most highly qualified publicists of the various nations, as subsidiary means for the determination of rules of law."

42  CONVENTION ON THE SETTLEMENT OF INVESTMENT DISPUTES

### VII. PLACE OF PROCEEDINGS

44. In dealing with proceedings away from the Centre, Article 63 provides that proceedings may be held, if the parties so agree, at the seat of the Permanent Court of Arbitration or of any other appropriate institution with which the Centre may enter into arrangements for that purpose · These arrangements are likely to vary with the type of institution and to range from merely making premises available for the proceedings to the provision of complete secretariat services.

### VIII. DISPUTES BETWEEN CONTRACTING STATES

45. Article 64 confers on the International Court of Justice jurisdiction over disputes between Contracting States regarding the interpretation or application of the Convention which are not settled by negotiation and which the parties do not agree to settle by other methods · While the provision is couched in general terms, it must be read in the context of the Convention as a whole Specifically, the provision does not confer jurisdiction on the Court to review the decision of a Conciliation Commission or Arbitral Tribunal as to its competence with respect to any dispute before it.  Nor does it empower a State to institute proceedings before the Court in respect of a dispute which one of its nationals and another Contracting State have consented to submit or have submitted to arbitration, since such proceedings would contravene the provisions of Article 27, unless the other Contracting State had failed to abide by and comply with the award rendered in that dispute.

### IX. ENTRY INTO FORCE

46. The Convention is open for signature on behalf of States members of the Bank  It will also be open for signature on behalf of any other State which is a party to the Statute of the International Court of Justice and which the Administrative Council, by a vote of two-thirds of its members, shall have invited to sign No time limit has been prescribed for signature.  Signature is required both of States joining before the Convention enters into force and those joining thereafter (Article 67).  The Convention is subject to ratification, acceptance or approval by the signatory States in accordance with their constitutional procedures (Article 68).  As already stated, the Convention will enter into force upon the deposit of the twentieth instrument of ratification, acceptance, or approval.