# Exhibit D

Calendar No. 695

91st Congress } SENATE { Report
2d Session } { No. 91-702

LIBRARY
OF THE
NEW YORK LAW INSTITUTE
120 BROADWAY

# FOREIGN ARBITRAL AWARDS

February 13, 1970.—Ordered to be printed

Mr. Fulbright, from the Committee on Foreign Relations, submitted the following

# REPORT

[To accompany S. 3274]

The Committee on Foreign Relations, to which was referred the bill (S. 3274) to implement the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, having considered the same, reports favorably thereon without amendment and recommends that the bill do pass.

## Purpose

The purpose of S. 3274 (introduced by Senator Fulbright, by request, on December 19, 1969), is to implement the Convention on the Recognition and Enforcement of Foreign Arbitral Awards which was approved by the Senate on October 4, 1968, by a vote of 57 to 0 (Ex. Rept. No. 10, 90-2). The bill would create a new chapter under title 9 of the United States Code (the Federal Arbitration Act) dealing exclusively with the recognition and enforcement of awards pursuant to the provisions of the convention.

## Background

The Convention on the Recognition and Enforcement of Foreign Arbitral Awards was adopted at the conclusion of a United Nations conference which was held in New York from May 20 to June 10, 1958. The convention entered into force on June 7, 1959, and at the present it is in effect for 34 countries. Although the United States participated in the conference, the convention was not signed on behalf of our Government at that time because the American delegation felt that certain provisions were in conflict with some of our domestic laws. According to the administration, however, as a result of increasing support for the convention (both within and without the Government), the United States decided in favor of accession

37-010—70——1

and it was transmitted to the Senate for advice and consent on April 24, 1968. Even though the convention was approved in October 1968, the instrument of accession will not be deposited until S. 3274 is enacted into law.

## Section-by-Section Analysis

A summary of the proposed provisions of the new chapter 2 which would be added to the Federal Arbitration Act (title 9, U.S.C.) are set forth below:

Section 201 provides that the Convention shall be enforced in United States courts in accordance with the provisions of the new chapter.

Section 2. 2 defines the agreements or awards that fall under the Convention. The second sentence of section 202 is intended to make it clear that an agreement or award arising out of a legal relationship exclusively between citizens of the United Statts is not enforceable under the Convention in U.S. courts unless it has a reasonable relation with a foreign state.

Section 203 gives original jurisdiction over any action or proceeding falling under the Convention to the district courts of the United States regardless of the amount in controversy.

Section 204 contains provisions relating to venue with respect to such action or proceeding.

Section 205 permits removal of an action or proceeding relating to an agreement or award falling under the Convention from a State court to a district court of the United States.

Section 206 permits a court to direct that arbitration be held at the place provided for in the arbitration agreement "whether that place is within or without the United States." It also permits the court to appoint arbitrators in accordance with the provisions of the agreement.

Section 207 provides that within 3 years after an arbitral award is made, any party to the arbitration may apply to any court having jurisdiction for an order confirming the award against any party to the arbitration.

Section 208 makes the provisions of the Federal Arbitration Act applicable to actions brought under the Convention to the extent that such provisions are not in conflict with the implementing legislation or the Convention as ratified by the United States.

## Committee Action and Recommendation

The Committee on Foreign Relations held a public hearing on S. 3274 on February 9, 1970, at which time Mr. Richard D. Kearney, Office of the Legal Adviser, Department of State, testified in support of the bill. The transcript of that hearing is reprinted in the appendix to this report.

The committee has received a number of communications from lawyers and businessmen urging early and favorable action on S. 3274, and so far as is known, there is no opposition to the bill. It

has the suppo
Arbitration As
the Departmen
In the comm
best interests
them to submi
for awards whi
The committee
3274 at an early

ɔr advice and consent on April
was approved in October 1968,
be deposited until S. 3274 is

N ANALYSIS

ns of the new chapter 2 which
ation Act (title 9, U.S.C.) are

'onvention shall be enforced in
ce with the provisions of the

ents or awards that fall under
ence of section 202 is intended
. or award arising out of a legal
itizens of the United Statts is
ention in U.S. courts unless it
eign state.
liction over any action or pro-
on to the district courts of the
ount in controversy.
relating to venue with respect

n action or proceeding relating
under the Convention from a
e United States.
direct that arbitration be held
rbitration agreement "whether
United States." It also permits
accordance with the provisions

3 years after an arbitral award
tion may apply to any court
confirming the award against

ns of the Federal Arbitration
under the Convention to the
ot in conflict with the imple-
tion as ratified by the United

RECOMMENDATION

ons held a public hearing on
ime Mr. Richard D. Kearney,
t of State, testified in support
ng is reprinted in the appendix

ber of communications from
and favorable action on S.
no opposition to the bill. It

has the support of the American Bar Association, the American Arbitration Association, the International Chamber of Commerce, the Department of Justice and the Bureau of the Budget.

In the committee's view, the provisions of S. 3274 will serve the best interests of Americans doing business abroad by encouraging them to submit their commercial disputes to impartial arbitration for awards which can be enforced in both U.S. and foreign courts. The committee recommends, therefore, that the Senate approve S. 3274 at an early date.

# APPENDIX

## HEARING HELD BEFORE THE COMMITTEE ON FOREIGN RELATIONS ON FEBRUARY 9, 1970

The CHAIRMAN. The next matter on the agenda this morning is on S. 3274, to implement the Convention on the Recognition and Enforcement of Foreign Arbitral Awards. Mr. Richard D. Kearney will testify for the Department of State.

Mr. Kearney, do you have a prepared statement?

### STATEMENT OF RICHARD D. KEARNEY, CHAIRMAN OF THE SECRETARY OF STATE'S ADVISORY COMMITTEE ON PRIVATE INTERNATIONAL LAW; ACCOMPANIED BY HERMAN MARCUSE, DEPARTMENT OF JUSTICE

Mr. KEARNEY. Yes, sir, I do.

The CHAIRMAN. Will you proceed, sir.

Mr. KEARNEY. Thank you, Mr. Chairman.

During the hearing before the Foreign Relations Committee on United Nations Convention on the Recognition and Enforcement of Foreign Arbital Awards the question if implementing legislation was discussed and it was made clear that the United States would not deposit its instrument of accession until the necessary implementing legislation had been enacted. The bill which is presently before you sets up the legal structure that is required to implement the Convention. The legislation has been cast in the form of an addition to title 9 of the United States Code, which contains the United States Arbitration Act. This proposal for a new chapter represents somewhat of a change in the original plans for implementing legislation which were discussed in the hearing on the Convention. At that time we were considering amendments to certain sections of the United States Arbitration Act and title 28 of the United States Code, the Federal Civil Procedure Act, as appears on page 8 of the committee's report (Ex. Rept. 10, 90th Congress, second session). The letter to the Vice President transmitting the legislation explains the reason for the change in plans, which was basically to avoid the confusion which might result from a series of minor changes in the different sections of the Arbitration Act as between cases falling under the act in its present form and cases falling under the Convention.

The kind of problem that we wished to avoid is well illustrated by section 202 of the new chapter 2. This section defines the arbitral agreements or awards that are considered to fall under the Convention for the purposes of the implementing legislation.

Paragraph 1 of article I of the Convention provides that the Convention applies to the recognition and enforcement of arbitral awards without any limitation as to the nature of the relationship that gave rise to the award. It might, for example, be a question of family status. However, paragraph 3 of article I of the Convention permits a state party to the Convention to file a declaration that the Convention will apply only to legal relationships that are considered as commercial under the national law of that state. As was stated in the hearings on the Convention, the United States will file such a declaration because our purpose in adhering to the Convention is for the beneficial effects it will produce for the foreign commerce of the United States and not to make any changes with respect to matters that are traditionally within the jurisdiction of the 50 States of the Union.

Consequently it is necessary to include the substance of this limiting declaration in the legislation that implements the Convention. This is what the first sentence of section 202 intends. It was not, of course, necessary to make any reference to the national law of the United States in the first sentence of section 202 because the definition of commerce contained in section 1 of the original Arbitration Act is the national law definition for the purposes of the declaration. A specific reference, however, is made in section 202 to section 2 of title 9, which is the basic provision of the original Arbitration Act.

At the same time we were faced with the problem that section 1 of the act, which defines commerce, specifically includes both interstate and foreign commerce, while the implementation of the Convention should be concerned only with foreign commerce. Consequently it was necessary to modify the definition of commerce to make it quite clear that arbitration arising out of relationships in interstate commerce remains under the original Arbitration Act and is excluded from the operation of the proposed chapter 2.

To achieve this result we have included in section 202 a requirement that any case concerning an agreement or award solely between U.S. citizens is excluded unless there is some important foreign element involved, such as property located abroad, the performance of a contract in a foreign country, or a similar reasonable relation with one or more foreign states. The reasonable relationship criterion is taken from the general provisions of the Uniform Commercial Code. Section 1–105(1) of the code permits the parties to a transaction that bears a reasonable relationship to any other state or nation to specify that the law of that state or nation will govern their rights and duties.

In this connection, of course, it should be recalled that what we are dealing with under the Convention is solely a situation in which the parties have voluntarily agreed to arbitration. The Convention and implementing legislation will apply to a transaction will apply to a transaction only because the parties to that transaction have agreed to settle disputes by arbitration. The provision on choice of law in the Uniform Commercial Code is also based on the same kind of voluntary action by the parties to a transaction. Since the Commercial Code is basic law on commercial transactions in the United States it seemed appropriate to incorporate its test of reasonable relationship into the implementing legislation on foreign arbitral awards.

The declaration limiting the application of the Convention to commercial matters applies both to the recognition and enforcement

ɔn provides that the Con-
cement of arbitral awards
:he relationship that gave
question of family status.
ɔnvention permits a state
. that the Convention will
considered as commercial
stated in the hearings on
uch a declaration because
s for the beneficial effects
he United States and not
ers that are traditionally
e Union.
substance of this limiting
s the Convention. This is
ds. It was not, of course,
tional law of the United
because the definition of
nal Arbitration Act is the
he declaration. A specific
section 2 of title 9, which
tion Act.
problem that section 1 of
includes both interstate
tation of the Convention
erce. Consequently it was
rce to make it quite clear
in interstate commerce
and is excluded from the

section 202 a requirement
ward solely between U.S.
nportant foreign element
l, the performance of a
reasonable relation with
relationship criterion is
iform Commercial Code.
ties to a transaction that
state or nation to specify
rn their rights and duties.
be recalled that what we
lely a situation in which
tration. The Convention
a transaction will apply
to that transaction have
ne provision on choice of
based on the same kind
nsaction. Since the Com-
ansactions in the United
e its test of reasonable
tion on foreign arbitral

n of the Convention to
gnition and enforcement

of arbitral awards under article 1 of the Convention and to the recognition of an agreement to arbitrate under article 2 of the Convention. Consequently the provisions of section 202 or the implementing legislation are applied specifically both to enforcement of arbitration agreements and of arbitral awards.

Sections 203, 204, and 205 of the new chapter 2 take care of certain technical problems arising out of differences between the original Arbitration Act and the convention. Under section 4 of the original act an application for enforcement of an arbitration agreement may be made to a U.S. district court which, "Save for the agreement, would have jurisdiction under title 28 in a civil action or in admiralty of the subject matter * * *." This makes such a case subject to the amount-in-controversy provisions of title 28 relating to actions based on a Federal question or on diversity of citizenship.

The arbitration convention does not contain any provisions with respect to the amount in controversy. For the effective implementation of the convention, therefore, section 203 gives the district courts of the United States original jurisdiction in cases arising under the convention "regardless of the amount in controversy."

The venue provisions in section 204 of the new chapter are substantially the same as those of the original act with one exception. If an arbitration agreement falling under the convention specifies a particular place in the United States where the arbitration is to take place, an enforcement action may be filed in the U.S. court for the district where that place is. To illustrate—Mr. Smith of Chicago and Mr. Jones of London agree to arbitrate any dispute arising out of a contract for the export of machinery from the United Kingdom to the United States at the office of the American Arbitration Association in New York City. A dispute arises and Mr. Smith of Chicago refuses to comply with the agreement to arbitrate. Mr. Jones of London could seek enforcement of the agreement either in the northern district of Illinois or the southern district of New York. On the other hand, if Mr. Jones refuses to arbitrate, Mr. Smith can seek enforcement either in the southern district of New York, or in the appropriate court in London. The provision in section 204 has obvious practical advantages since the arbitration machinery selected by the parties will be within the immediate purview of the enforcing court and the original agreement of the parties with respect to the appointment of arbitrators and the like can be conveniently carried out.

The original Arbitration Act does not contain specific provisions regarding removal to the Federal courts of cases that may fall under it. The case law on the right or removal is not settled. In the *Prima Paint Case* (388 U.S. 395—1967), however, the Supreme Court made it quite clear that arbitration agreements relating to interstate or foreign commerce were fully within the ambit of Federal law. On this basis, it appears appropriate, particularly in implementing a treaty, to clarify the removal issue. Section 205 provides a right to remove an action relating to an arbitration agreement or arbitral award falling under the Convention from a State court to the appropriate district court.

Because we are dealing solely with foreign commerce it appears very likely that many of the arbitration agreements falling under the Convention will provide for arbitration outside the United States.

In commodity contracts, for example, provisions for arbitration in London under Corn Exchange rules are quite common. The uniform Arbitration Act provides that the district court may direct "the parties to proceed with the arbitration in accordance with the terms thereof." However, in this area the case law is not clear whether the district court will order an arbitration to be held outside the United States. To clarify this issue, section 206 specifically provides that the district court may order the arbitration held at the place provided in a contract "whether that place is within or without the United States."

Section 207 deals with two problems relating to the enforcement of foreign arbitral awards. The Uniform Arbitration Act has a time period of 1 year within which an application may be made for an order confirming an award. The Arbitration Convention does not contain any specific provision on this point. However, all of the experts on arbitration who worked with us considered that a 1-year period for the enforcement of foreign arbitral awards was much too short. In many cases enforcement would normally be sought outside the United States as a first step. An action would be filed here only after efforts to obtain enforcement in a foreign country had failed. It was, therefore, essential to allow time for these initial enforcement efforts outside the United States and the consensus was that 3 years is a reasonable period in these circumstances. The second problem was that the grounds for refusal or deferral of the recognition or enforcement of an arbitral award are somewhat different under the Uniform Arbitration Act than under the Convention. For example the Convention has a specific reference to the incapacity and thus leaves this to be dealt with under the general law of contracts. To avoid any possible conflict section 207 provides that the refusal and deferral clauses of the Convention are controlling.

Finally in section 208——

The CHAIRMAN. What do you mean by incapacity; mental incapacity?

Mr. KEARNEY. Mental incapacity, infancy, that series of problems.

The CHAIRMAN. I see.

Mr. KEARNEY. Finally in section 208 we have a residual clause under which the original Arbitration Act applies to all matters arising under the legislation implementing the convention except when the convention or the implementing legislation have conflicting provisions.

We believe that the proposed chapter 2 reconciles the major differences that exist because of the differences between the language and conceptual approach of the convention and of title 9 and 28 of the United States Codes, and that the proposed system of implementation through the U.S. district courts will assist the uniform and efficient enforcement of arbitration agreements and awards in foreign commerce.

Thank you, Mr. Chairamn.

I should add Mr. Herman Marcuse of the Department of Justice is here also and would answer any questions that fall more in the sphere of that Department than in the State Department.

The CHAIRMAN. Is it contemplated that any of the arbitration awards may be submitted to the World Court?

Mr. KEARNEY. No, Mr. Chairman.

The CHAIRMAN. The World Court has nothing whatever to do with it?

Mr. KEARNEY. Nothing whatever. This implementing legislation puts the implementation in the U.S. district courts.

The CHAIRMAN. Or in London. You mentioned an example dealing with an appropriate court in London.

Mr. KEARNEY. Yes, sir.

This is implementing legislation for the United States.

The CHAIRMAN. Yes.

Mr. KEARNEY. Under an arbitration agreement such as I mentioned.

The CHAIRMAN. Yes.

Mr. KEARNEY. Where you have three points of contact; London, New York, Chicago.

The CHAIRMAN. Yes.

Mr. KEARNEY. Under our legislation, under the legislation as drafted, as far as the United States is concerned, the action could be brought in Chicago or in New York City. If the particular plaintiff, the Chicago merchant, decided he would rather sue in London under English law for some reason than in New York, this would be up to him to decide.

The CHAIRMAN. I thought perhaps the parties who make the agreement could agree to submit it to the World Court believing that they might get a more impartial view there. Are they restricted or prohibited from doing this? Supposing you had a man who lives in Amsterdam, we will say, at The Hague, could he submit it to the World Court? I am just curious.

Mr. KEARNEY. No, he could not, Mr. Chairman.

The CHAIRMAN. He could not.

Mr. KEARNEY. Because the International Court only hears disputes between states.

The CHAIRMAN. I see.

Mr. KEARNEY. Or advisory—requests for advisory opinions from international organizations.

The CHAIRMAN. So even if he wanted to he couldn't. I wanted to make this clear.

Mr. KEARNEY. He could not.

The CHAIRMAN. The Senate approved the Convention on the Recognition and Enforcement of Foreign Arbitral Awards in October of 1968.

Why did it take so long to submit this implementing legislation?

Mr. KEARNEY. The reason, Mr. Chairman, was that the American Bar Association had prepared or suggested some implementing legislation, and we thought that was perfectly adequate.

But before we sent it up we had it checked by the Advisory Committee on Private International Law which has representatives of all the major legal organizations on it, and the judges and practicing lawyers on the committee decided that if we scattered these different sections around through titles 28 and 9 that it would make it more difficult on the practicing lawyer and the judge to handle cases of this character. So they suggested that we get together a committee of experts in order to review the proposals of the American Bar Association and put them into, in effect, one chapter or consider how best we could do it, and we had several meetings with experts on this. They decided putting all the provisions in this chapter 2 of the Arbitration

Act was the best way of doing it. The review by the experts also indicated a series of problems that weren't taken care of in the American Bar Association proposals and we worked those out, and the process of doing this managed to take up about a year.

The CHAIRMAN. Well, I just wanted to make it clear that this delay, which some people constantly complain about as being due to the Congress, and the Senate in particular, is not due to the Senate because this legislation was only received in December, and it is now being taken up. The delay was due to the reasons you have just given and not in any way attributable to dilatory tactics on the part of the Senate Committee on Foreign Relations; is that right?

Mr. KEARNEY. That is absolutely correct, Mr. Chairman. It is really due to the fact that particing lawyers wanted to be sure they could handle this problem.

The CHAIRMAN. I wanted to make it clear it wasn't our fault. I may say this was true of a number of pieces of legislation last year. They came up very late; not nearly as soon as they normally do.

Does this legislation have any effect whatever on State laws?

Mr. KEARNEY. No, Mr. Chairman, it does not. It concerns in effect solely the jurisdiction of the Federal district courts.

The CHAIRMAN. And it does not alter or change a citizen's rights under State laws?

Mr. KEARNEY. Not at all.

The CHAIRMAN. Does it in any way broaden Federal authority?

Mr. KEARNEY. Not basically. It provides for the right of removal to the district court from the State court in a case that falls under the Convention, but what we are dealing with is foreign commerce which now is fully within the ambit of Federal authority.

The CHAIRMAN. Whether or not this comes into effect all depends upon an agreement entered into voluntarily but the parties. Is that correct?

Mr. KEARNEY. That is correct, sir.

The CHAIRMAN. In other words, you are not imposing this on people who do not wish any particular procedure; is that correct?

Mr. KEARNEY. That is absolutely correct.

The CHAIRMAN. So that what you are doing is setting up a procedure by which citizens who would normally be of different countries and who wished to resort to this method of settling their differences could do so; is that correct?

Mr. KEARNEY. That is correct, sir.

The CHAIRMAN. So there is no possible opposition based upon the idea we are now reaching out and subjecting citizens to further arbitrary intervention of the Federal authorities or any other authorities in their private affairs. That is not justified; is that correct?

Mr. KEARNEY. That is correct.

The basic reason that we propose this legislation and to become party to the Convention is because the people engaged in foreign trade consider arbitration is a very economical and speedy way of settling commercial disputes and they are the ones who wanted this.

The CHAIRMAN. Correct.

It is a more sophisticated way of dealing with these matters.

Mr. KEARNEY. That is correct also.

The CHAIRMAN. One last unrelated question. The staff just called my attention to the fact that you have the personal rank of ambassador. How did that happen? Could you also tell us on what grounds and in what respect is it of help and of importance to you and why do you need it?

Mr. KEARNEY. Yes, sir.

The President accorded me the personal rank of ambassador after I became a member of the United Nations International Law Commission and the basic reason was that of the 25 members of the Commission four were ministers of justice and another 12 or 13 were ambassadors, and the basic thought was that it would be desirable that I have approximately the same rank as the rest of the people on the Commission.

From the standpoint of the Commission I think it is valuable to be on the same status as other people who are engaged in a particular form of activity. For example, at conferences I have been to recently almost every head of the delegation had the rank of ambassador. This is just sort of a standard thing in international organization activities now and I suppose it is somewhat a question of face.

The CHAIRMAN. A question of face. If you weren't an ambassador they wouldn't treat you with proper respect; is that what it comes to?

Mr. KEARNEY. No; they would treat me with proper respect I am sure.

The CHAIRMAN. What do you mean when you say it is a matter of face? Is it your face or the face of the United States that is involved?

Mr. KEARNEY. Well, I think it is the face—not necessarily the United States, but that it makes dealing with the other people somewhat easier. They consider you as roughly their—on the same status.

The CHAIRMAN. They would feel demeaned to speak to you if you weren't an ambassador; is that correct?

Mr. KEARNEY. No; I don't think they would at all.

The CHAIRMAN. How would it affect you? This is a great mystery to me. The methodology of the State Department puzzles some of us more common types very deeply and I just wondered about it. I just can't quite understand it. How you would suffer from having been a minister or whatever you were rather than an ambassador. You obviously aren't an ambassador to a foreign country in the sense that the word is used in the Constitution.

Mr. KEARNEY. No, sir; that is quite true.

The CHAIRMAN. What is the difference between an ambassador with a personal rank and a special representative of the President? What would be the difference in the way they would receive you?

Senator AIKEN. I would like to answer that. The Ambassador gets invited.

The CHAIRMAN. To what?

Senator AIKEN. To whatever it is. The higher the level, the better.

The CHAIRMAN. You mean you would not be invited to dinner if you hadn't been an ambassador?

Mr. KEARNEY. No, sir.

Senator AIKEN. It would depend on the dinner.

The CHAIRMAN. Is that what the Senator means? I have seen lots of people at the White House who are not ambassadors. In fact the major part of them are not. They are contributors; they are primarily

contributors. That is what it takes to get invited to the biggest dinner party. You don't have to be an ambassador. I don't understand the rationale for it. This is a matter that I am sure is not your business but if you could throw any light on it sometime at a later date I would welcome it.

Mr. KEARNEY. I have a hard enough time with these private law international problems.

The CHAIRMAN. I know you didn't originate it but I thought since you were one of them I might ask you about it. I don't see that you have suffered any great harm in what the title is. The trouble with this practice is that it mixes up the concept of ambassadors. Under the Constitution they are supposed to be confirmed by the Senate and it is supposed to be a matter of considerable prestige with a very special international connotation, and to begin to use the title in other ways seems to me to confuse the matter. That is primarily the thing that troubles us.

Senator Aiken, are you going to enlighten me?

Senator AIKEN. It will take quite a while to enlighten you on that, I would think.

You mentioned the fact that a matter could be transferred from the State court to the district court. Who would arrange for the transfer?

Mr. KEARNEY. This would be done by action of the party in the normal removal way. This, of course, would be a suit between two private parties.

Senator AIKEN. One of the parties then?

Mr. KEARNEY. One of the parties would file a writ in a district court asking for removal.

Senator AIKEN. Would you say that this convention would in no way affect decisions or operations of the World Court?

Mr. KEARNEY. No, sir.

Senator AIKEN. Are you favorably impressed with the operations of the World Court?

Mr. KEARNEY. On the whole, yes. I could disagree with some of its decisions but then we all disagree with some of the decisions of courts.

Senator AIKEN. How many cases do they hear a year on the average?

Mr. KEARNEY. I do not have the statistics in my mind. In the last year they decided two cases, one the *North Sea Gas and Oil* case, and the other the *Barcelona Traction* case. This is perhaps not too bad an average for an International Court of this character.

What are involved are disputes between states that they consider important enough to put to this Court, and states are somewhat reluctant to submit cases to the International Court. They would rather settle it by diplomacy or in a similar fashion.

Senator AIKEN. Of the two cases they decided last year, was the decision accepted by both parties after it was made.

Mr. KEARNEY. Yes, Senator.

Senator AIKEN. It was?

Mr. KEARNEY. Yes.

Senator AIKEN. Was that usual?

Mr. KEARNEY. Yes. Some of the issues remain to be worked out. The *North Sea Oil and Gas* case is a complicated decision involving the rights to exploit the Continental Shelf in the North Sea for gas and

get invited to the biggest dinner
ıassador. I don't understand the
t I am sure is not your business
sometime at a later date I would

ıgh time with these private law

t originate it but I thought since
ɔu about it. I don't see that you
at the title is. The trouble with
concept of ambassadors. Under
to be confirmed by the Senate
of considerable prestige with a
n, and to begin to use the title
se the matter. That is primarily

lighten me?
ı while to enlighten you on that,

atter could be transferred from
t. Who would arrange for the

e by action of the party in the
, would be a suit between two

then?
would file a writ in a district

ıat this convention would in no
the World Court?

impressed with the operations of

I could disagree with some of its
ı some of the decisions of courts.
lo they hear a year on the aver-

tatistics in my mind. In the last
*North Sea Gas and Oil* case, and
. This is perhaps not too bad an
this character.
ɪtween states that they consider
ourt, and states are somewhat
ternational Court. They would
milar fashion.
they decided last year, was the
er it was made.

ssues remain to be worked out.
ɪmplicated decision involving the
lf in the North Sea for gas and

oil deposits. And Germany was trying to get a bigger slice, if possible, under the rules relating to the Continental Shelf, from the Netherlands—it was not the United Kingdom—wait a minute, the parties slip my mind a moment, it was—it was the Netherlands and Denmark. They will have to go through this process of drawing these lines in accordance with the decision to, in effect, give, cut pieces of pie out of the Continental Shelf.

Senator AIKEN. Do you recall how many cases the World Court has decided in which the United States was one of the litigants?

Mr. KEARNEY. The United States has participated in a number of the requests for advisory opinions.

Senator AIKEN. In an advisory class?

Mr. KEARNEY. Yes; advisory opinions.

Senator AIKEN. But not as a litigant.

Mr. KEARNEY. We have filed, we filed during the fifties a series of cases involving injury or damage to airplanes, for example, against the Soviet Union and some of the Eastern European countries; but these were not litigated, they were not heard, because the countries had not accepted the mandatory jurisdiction of the Court, and as a result of this we were, in effect, nonsuited.

Of course, one problem is, and one thing that somewhat intimidates us from going to the Court is that under the Connally reservation since we have the right to claim any matter is within our domestic jurisdiction any other party that has accepted the mandatory jurisdiction of the Court has precisely this same right. That is, since we have the reservation they can claim the reservation against us also. Bulgaria did just this in an aerial incident case. In some cases, and I wouldn't like to mention any particular states involved, but in some cases where we have proposed going to the Court the other country has said "If you take us to Court, if you file a petition in the Court, we will claim the Connally reservation against you, and you won't be able to proceed with your case."

Senator AIKEN. How many decisions affecting the United States have actually been granted by the World Court?

Mr. KEARNEY. No final decisions directly affecting the United States.

Senator AIKEN. None at all?

Mr. KEARNEY. That is my recollection, directly to which the United States was a litigating party. But I will have to check that.

Senator AIKEN. Well, the reason I asked that, I think there were a couple of cases in which the verdict of the Court was not accepted; therefore, as far as we are concerned, I don't see what the World Court has been but a toal loss in settling our international disputes.

Mr. KEARNEY. We have benefited indirectly in a number of cases. If, for example, in the El Al airplane incident with Bulgaria——

Senator AIKEN. My assistant says we got an advisory opinion from the World Court as to the legality of the United Nations bonds.

Mr. KEARNEY. That is correct.

Senator AIKEN. That was a wonderful idea and it worked so that the smaller countries of the world made the appropriations and levied the assessments. Otherwise four or five of the big countries would have paid the bill. That was when President Kennedy was in the White House.

Mr. KEARNEY. That is correct.

Excuse me, I remember we have been involved in three litigated cases.

We did litigate certain rights in Tangiers, a case involving the rights of U.S. nationals in Tangiers.

There may be one or two others; I can get a list for you, Senator, if you would like.

Senator AIKEN. I was just trying to think of some way in which the World Court might have been a benefit.

(The following information was subsequently supplied.)

> Two of these were disposed of on procedural grounds. In what is known as the *Albanian Gold* case, the issue was whether certain gold seized in Rome after World War II by the Allies should go to Italy or to Albania who had conflicting claims to ownership, or to the United Kingdom in order partially to pay the damage judgment against Albania which the World Court had handed down in the *Corfu Channel* case. The United States had no direct interest. It was a stakeholder as a member of a tripartite commission set up to hold the gold until proper disposition of it could be made. The World Court dismissed the case because Albania refused to become a party and the Court considered Albania's participation essential to adjudication of the issues.
>
> A second case likewise did not go to final judgment. This was the dispute between Switzerland and the United States over whether the vesting by the United States of shares of General Aniline and Film Co. was justified on the ground that the German cartel I. G. Farben was the actual owner although the shares themselves were held by Interhandel, a Swiss company. The Court issued rulings on certain preliminary matters but declined to proceed to consideration of the principal issue because the U.S. Supreme Court had issued an order reopening the action which had been dismissed by the U.S. district court because Interhandel had not produced certain documents. As things turned out the dispute was settled by a subsequent compromise agreement between Switzerland and the United States and therefore never got back to the World Court.
>
> The third case, which was the only one that proceeded to a judgment on the merits, was brought by France, as the protecting power in Morocco, against the United States. The United States claimed U.S. citizens were exempt from certain economic and fiscal measures in Morocco on the basis of an 1837 treaty that gave jurisdiction in Morocco over U. S. citizens to the American consul in certain cases, as well as a unilateral grant of most-favored-nation treatment. The World Court, while recognizing the continued applicability of the 1837 treaty on the major points in issue, rejected claims that the treaty required the assent of the United States before laws or regulations could be applied to citizens of the United States in the French zone of Morocco and decided that the most-favored-nation clause did not require the continuation of privileges to the United States after the

most favored nations, in this case the United Kingdom and Spain, had themselves renounced such privileges. It should be noted that after Morocco gained her independence in 1956 the United States renounced its right to extraterritorial jurisdiction.

Requests for advisory opinions can only be made by the organs and specialized agencies of the United Nations. However, the United States submitted a brief to the Court on the legal issues raised in each of the 12 requests the Court has dealt with and presented oral arguments in three of these proceedings.

Senator AIKEN. Do you know of any objections to this particular bill?

Mr. KEARNEY. No, Senator, I do not.

Senator AIKEN. You don't. I believe the American Bar Association has already approved it.

Mr. KEARNEY. It has, Senator?

Senator AIKEN. Yes.

I have no more questions.

The CHAIRMAN. Mr. Marcuse, do you wish to make any comment?

Mr. MARCUSE. No.

The CHAIRMAN. I don't see any objections myself. Do either of you have anything further to say.

Mr. KEARNEY. No, thank you, sir.

The CHAIRMAN. I hope we won't be as long passing it as you were bringing it up.

Mr. KEARNEY. I hope not.

The CHAIRMAN. By the way, it occurred to me when I was asking you, was Ben Franklin a personal ambassador? Did he have the personal rank of ambassador?

Mr. KEARNEY. Ben Franklin?

The CHAIRMAN. Yes.

Mr. KEARNEY. As a matter of fact, my recollection is that the United States did not use the title of ambassador until about 1870 or something like that.

The CHAIRMAN. So he didn't have the personal rank of ambassador?

Mr. KEARNEY. I would think he would have been an envoy extraordinary.

The CHAIRMAN. That is what I think. I just wondered. He did pretty well considering all his limitations, didn't he?

Mr. KEARNEY. He did very well.

The CHAIRMAN. He was even invited to dinner, I am told. Thank you very much, Mr. Kearney.

Mr. KEARNEY. Thank you, Mr. Chairman.

## CHANTES IN EXISTING LAW

In compliance with subsection 4 of rule XXIX of the Standing Rules of the Senate, changes in existing law made by the bill (S. 3274), as reported, as shown as follows (existing law proposed to be omitted is enclosed in black brackets, new matter is printed in italic, existing law in which no change is proposed is shown in roman):

### *"Chapter 2.—CONVENTION ON RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS*

*"Sec.*
*"201. Enforcement of Convention.*
*"202. Agreement or award falling under the Convention.*
*"203. Jurisdiction; amount in controversy.*
*"204. Venue.*
*"205. Removal of cases from State courts.*
*"206. Order to compel arbitration; appointment of arbitrators.*
*"207. Award of arbitrations; confirmation; jurisdiction; proceeding.*
*"208. Chapter 1; residual application.*

**"§ 201. *Enforcement of Convention***

*"The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, shall be enforced in United States courts in accordance with this chapter.*

**"§ 202. *Agreement or award falling under the Convention***

*"An arbitration agreement or abritral award arising out of a legal relationship, whether contractual or not, which is considered as commercial, including a transaction, contract, or agreement described in section 2 of this title, falls under the Convention. An agreement or award arising out of such a relationship which is entirely between citizens of the United States shall be deemed not to fall under the Convention unless that relationship involves property located abroad, envisages performance or enforcement abroad, or has some other reasonable relation with one or more foreign states. For the purpose of this section a corporation is a citizen of the United States if it is incorporated or has its principal place of business in the United States.*

**"§ 203. *Jurisdiction; amount in controversy***

*"An action or proceeding falling under the Convention shall be deemed to arise under the laws and treaties of the United States. The district courts of the United States (including the courts enumerated in section 460 of title 28) shall have original jurisdiction over such an action or proceeding, regardless of the amount in controversy.*

**"§ 204. *Venue***

*"An action or proceeding over which the district courts have jurisdiction pursuant to section 203 of this title may be brought in any such court in which save for the arbitration agreement an action or proceeding with respect to the controversy between the parties could be brought, or in such court for the district and division which embraces the place designated in the agreement as the place of arbitration if such place is within the United States.*

**"§ 205. *Removal of cases from State courts***

*"Where the subject matter of an action or proceeding pending in a State court relates to an arbitration agreement or award falling under the Convention, the defendant or the defendants may, at any time before the trial thereof, remove such action or proceeding to the district court of the United States for the district and division embracing the place where the action or proceeding is pending. The procedure for removal of causes otherwise provided by law shall apply, except that the ground for removal provided in this section need not appear on the face of the complaint but may be shown in the petition for removal. For the purposes of Chapter 1 of this title any action or proceeding removed under this section shall be deemed to have been brought in the district court to which it is removed.*

**"§ 206. Order to compel arbitration; appointement of arbitrators**

"A court having jurisdiction under this chapter may direct that arbitration be held in accordance with the agreement at any place therein provided for, whether that place is within or without the United States. Such court may also appoint arbitrators in accordance with the provisions of the agreement.

**"§ 207. Award of arbitrators; confirmation; jurisdiction; proceeding**

"Within three years after an arbitral award falling under the Convention is made, any party to the arbitration may apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration. The court shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention.

**"§ 208. Chapter 1; residual application**

"Chapter 1 applies to actions and proceedings brought under this chapter to the extent that chapter is not in conflict with this chapter or the Convention as ratified by the United States."

SEC. 2. Title 9, United States Code, is further amended by inserting at the beginning:

| "Chapter | Sec. |
|---|---|
| 1. General provisions | 1 |
| 2. Convention on the Recognition and Enforcement of Foreign Arbitral Awards | 201" |

SEC. 3. Sections 1 through 14 of title 9, United States Code, are designated "Chapter 1" and the following heading is added immediately preceding the analysis of sections 1 through 14:

**"Chapter 1.—GENERAL PROVISIONS"**

SEC. 4. This Act shall be effective upon the entry into force of the Convention on Recognition and Enforcement of Foreign Arbitral Awards with respect to the United States.

○